**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**


The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE    MAR 0 2 2017

for CHIEF JUSTICE

This opinion was filed for record

at 8:00 am  on Mar. 2, 2017

SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, <br><br> Respondent, <br><br> v. <br><br> ZYION HOUSTON-SCONIERS, <br><br> Petitioner. | NO. 92605-1 <br><br> EN BANC <br><br> Filed    MAR 0 2 2017 |
| STATE OF WASHINGTON, <br><br> Respondent, <br><br> v. <br><br> TRESON LEE ROBERTS, <br><br> Petitioner. | |
| In the Matter of the Personal Restraint of <br><br> ZYION HOUSTON-SCONIERS, <br><br> Petitioner. | |

GORDON McCLOUD, J.—"[C]hildren are different." *Miller v. Alabama*, ___ U.S. ___, 132 S. Ct. 2455, 2470, 183 L. Ed. 2d 407 (2012). That difference has constitutional ramifications: "An offender's age is relevant to the Eighth

Amendment, and [so] criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed." *Graham v. Florida*, 560 U.S. 48, 76, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010); U.S. CONST. amend. VIII.

The defendants in this case—Zyion Houston-Sconiers and Treson Roberts—are children. On Halloween night in 2012, they were 17 and 16 years old, respectively. They robbed mainly other groups of children, and they netted mainly candy.

But they faced very adult consequences. They were charged with crimes that brought them automatically into adult (rather than juvenile) court, without any opportunity for a judge to exercise discretion about the appropriateness of such transfers. They had lengthy adult sentencing ranges calculated under adult Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, rules. And they received lengthy adult firearm sentence enhancements, with their mandatory, consecutive, flat-time consequences, without any opportunity for a judge to exercise discretion about the appropriateness of that sentence increase, either.

As a result, Houston-Sconiers faced a sentencing range of 501-543 months (41.75-45.25 years) in prison. Clerk's Papers (Houston-Sconiers) (CPHS) at 227. Of that, 372 months (31 years) was attributable to the firearm sentence enhancements and would be served as "'flat time,'" meaning "in total confinement"

2

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

without possibility of early release. *Id.*; RCW 9.94A.533(3)(e). Roberts faced a sentencing range of 441-483 months (36.75-40.25 years) in prison. Clerk's Papers (Roberts) (CPR) at 154. Of that, 312 months (26 years) would be "'flat time'" attributable to the firearm sentence enhancements. *Id.*

To their credit, all participants in the system balked at this result. But they felt their hands were tied by our state statutes.

We now hold that the sentencing judge's hands are not tied. Because "children are different" under the Eighth Amendment and hence "criminal procedure laws" must take the defendants' youthfulness into account, sentencing courts must have absolute discretion to depart as far as they want below otherwise applicable SRA ranges and/or sentencing enhancements when sentencing juveniles in adult court, regardless of how the juvenile got there. We affirm all convictions but remand both cases for resentencing.

FACTS

On Halloween evening, October 31, 2012, petitioners Houston-Sconiers, then 17, and Roberts, then 16, met up at Roberts's home. 16 Verbatim Report of Proceedings (VRP) (July 22, 2013) at 1437-38. At some point, the two boys were joined by three friends, A.T., L.A., and Z.J. *Id.* at 1436-38. Together, the teens drank vodka, passed around marijuana, and played basketball. *Id.* at 1438-40. At

trial, L.A. testified that during this time, he saw Houston-Sconiers holding a silver revolver. *Id.* at 1454-55. According to L.A., Houston-Sconiers also had in his possession a "Jason mask," a white hockey mask. *Id.* at 1447. After a few hours, the five teens left the house to walk to Stanley Elementary School across the street. *Id.* at 1437, 1440. No one else was there, so L.A. and A.T. parted ways with the remaining three boys—petitioners and a 13-year-old boy named Z.J. *Id.* at 1441, 1443.

A little later that evening, after dark, Andrew Donnelly, 19, and his 13-year-old brother, S.D., were approached by a group of three boys in the North End neighborhood of Tacoma. 12 VRP (July 16, 2013) at 992-93. One boy held a silver gun and wore a "Jason mask," "a white hockey mask with holes in it." *Id.* at 993, 1004, 1020. The boys took the Donnellys' candy and Andrew Donnelly's red devil mask. *Id.* at 1000. Andrew Donnelly had a cell phone in his possession, but it was not taken. *Id.* at 997.

Also out trick-or-treating that night in the North End was a group of five high school students. 11 VRP (July 15, 2013) at 771-73. After a few hours out, they were approached by three boys wearing black hoodies and masks. *Id.* at 774-75, 819-20, 832, 871; 12 VRP (July 16, 2013) at 955. One of the masks was the red devil mask that had been taken from Andrew Donnelly. 12 VRP (July 16, 2013) at 956. One

4

of the boys had a silver gun. 11 VRP (July 15, 2013) at 781, 786; 12 VRP (July 16, 2013) at 957. The boys demanded the group's bags of candy and cell phones. 11 VRP (July 15, 2013) at 786, 872; 12 VRP (July 16, 2013) at 954. At least two of the youth had cell phones with them, but did not give them up. 11 VRP (July 15, 2013) at 786, 874. Several of them did, however, give up their bags of candy. 11 VRP (July 15, 2013) at 786, 821, 873; 12 VRP (July 16, 2013) at 958-59.

One youth, A.G., "hid" her bag of candy, turned, and walked to the nearest house. 11 VRP (July 15, 2013) at 821, 825. She rang the bell "[t]o get some help," struggling with what to say to the residents before finally telling them to "call the police." *Id.* at 825-26, 853. A.G. testified that while she was able to speak "with confidence" while trick-or-treating before the robbery, she "wasn't confident" at the house where she asked for help, and "was stuck" on what to say because the event was "unbelievable." *Id.* at 852, 826. A.G. also acknowledged that while no one in the group was physically hurt, they were "[r]eally scared." *Id.* at 859. She recognized the voice of one of the robbers as belonging to someone she knew as "Tiny," and identified "Tiny" at trial as Houston-Sconiers. *Id.* at 824-25. Although the two girls from the group, A.G. and D.P.M., were "scared to call the police," D.P.M.'s parents reported the robbery later that night. *Id.* at 856-57.

Some time later, Officer Rodney Halfhill responded to a call at a nearby apartment complex. 12 VRP (July 16, 2013) at 1067. A "frantic" 37-year-old African-American man named James Wright reported that he had just been robbed of his cell phone by "four to five black males," one of whom carried "a silver revolver" and wore "a Jason-style hockey mask." *Id.* at 1071, 1073-74. L.A. testified that when he again met up with petitioners and the third boy, Z.J., at the end of the evening, he watched petitioners steal a "middle age" African-American man's cell phone at gunpoint in an apartment complex. 16 VRP (July 22, 2013) at 1456. L.A. said they used the same gun that Houston-Sconiers had earlier that evening. *Id.* at 1454-55. L.A. also said that Roberts had come into possession of a "devil mask" and that one of the three boys—Roberts, Houston-Sconiers, or Z.J.—reported that they had been up in the North End. *Id.* at 1448.

The group of five scattered after taking the phone, then regrouped inside a broken-down, green Cadillac parked in a backyard nearby. *Id.* at 1457-58. A police K-9 unit found them in that car with candy wrappers strewn on the seats and floor. 11 VRP (July 15, 2013) at 738-40; Trial Ex. P-1. The five boys were ordered out of the car and arrested. 11 VRP (July 15, 2013) at 740-41; 13 VRP (July 17, 2013) at 1148-49.

No. 92605-1

The officers then got permission from the owner of the property, Dorothy Worthey, to search the Cadillac. 13 VRP (July 17, 2013) at 1155-56, 1171, 1220, 1229. Worthey told the officers that the car, which had three flat tires and was encompassed by vegetation, belonged to her son and had been parked in her yard for some time. *Id.* at 1156, 1171, 1186, 1224. The search of the Cadillac yielded a number of items, including "[a] white plastic mask," "a red plastic devil mask," and a backpack containing candy. 9 VRP (July 10, 2013) at 542, 545, 550. The police also recovered a .32 caliber Harrington & Richardson revolver from under the front passenger seat. *Id.* at 559-60. The gun was loaded, but with the wrong type of ammunition. 13 VRP (July 17, 2013) at 1281. The detective who tested that gun said that firing it with such mismatched ammunition could cause it to "fail to function and not fire at all" or "com[e] apart." *Id.* at 1288-89.

PROCEDURE

The State charged 16-year-old Roberts and 17-year-old Houston-Sconiers each with seven counts of robbery in the first degree, one count of conspiracy to commit robbery in the first degree, one count of unlawful possession of a firearm in the first degree, and one count of assault in the second degree, plus nine firearm enhancements. The robbery charges triggered Washington's mandatory automatic decline statute, RCW 13.04.030(1)(e)(v)(C), which mandates automatic transfer of

7

a case from juvenile to adult court without the hearing that is otherwise typically held to determine whether such transfer is appropriate.

At trial, the State dismissed one count of robbery in the first degree against each defendant for lack of evidence. 21 VRP (July 30, 2013) at 1943. Houston-Sconiers was convicted of six counts of robbery in the first degree, one count of conspiracy to commit robbery in the first degree, one count of assault in the second degree, and one count of unlawful possession of a firearm in the first degree, plus seven firearm enhancements. CPHS at 234-35. Roberts was acquitted of three of the charges but convicted of four counts of robbery in the first degree, one count of conspiracy to commit robbery in the first degree, and one count of assault in the second degree, plus six firearm enhancements. 24 VRP (Aug. 2, 2013) at 2372-77; CPR at 162-63.

As discussed above, Houston-Sconiers faced a sentencing range of 501-543 months (41.75-45.25 years) in prison. CPHS at 227. Of that, 372 months (31 years) was attributable to the firearm sentence enhancements, and would be served as "'flat time,'" meaning "in total confinement" without possibility of early release. *Id.*; RCW 9.94A.533(3)(e). Roberts faced a sentencing range of 441-483 months (36.75-40.25 years) in prison. CPR at 154. Of that, 312 months (26 years) would be "flat time" attributable to the firearm sentence enhancements. *Id.*

8

But the State recommended an exceptional sentence, below the standard range, of zero months on each of the substantive counts of the information. CPHS at 226-28. The State opined that its recommendation was technically unlawful, writing, "What is clear in this case is there are no statutorily legitimate reasons for imposition of an exceptional sentence downward." CPHS at 227. Nevertheless, it stated, "The rationale for this recommendation is based simply on the State's assessment that a 42 to 45 year sentence for Houston-Sconiers and a 37-40 year sentence for Roberts is perhaps excessive . . . ." CPHS at 228. (The State did not recommend a similar departure below the firearm sentence enhancements. *Id.* at 227-28.)

The trial court accepted the State's recommendation. It imposed no time on the substantive crimes but all the time triggered by the enhancements. This resulted in a total of 312 months of flat time for Roberts and 372 months of flat time for Houston-Sconiers. CPR at 167; CPHS at 239. At sentencing, the judge heard mitigating testimony regarding Houston-Sconiers's history of childhood abuse and placement in foster care, the extent to which Roberts may have been influenced by peer pressure or a disability, and both boys' potential for improving their lives. 24 VRP (Sept. 13, 2013) at 2395-96, 2397-98, 2410-11, 2413, 2416-17. The judge

No. 92605-1

expressed frustration at his inability to exercise greater discretion over the sentences imposed. *Id.* at 2401-03.

A split Court of Appeals affirmed the convictions and rejected all of petitioners' claims in a partly published opinion. *State v. Houston-Sconiers*, 191 Wn. App. 436, 446, 365 P.3d 177 (2015). Judge Bjorgen dissented, finding that the sentences imposed here were the functional equivalent of the mandatory life without parole sentences that *Miller* rejected. *Id.* at 453-54. He would also have struck down the automatic decline statute under the Eighth Amendment. *Id.* at 455 (Bjorgen, J., dissenting).

Houston-Sconiers also filed a timely pro se personal restraint petition (PRP), which the Court of Appeals consolidated with this case. Comm'r's Ruling, *State v. Houston-Sconiers*, No. 45374-6-II (Wash. Ct. App. Feb. 17, 2015). The Court of Appeals rejected the claims raised in that PRP. *Houston-Sconiers*, 191 Wn. App. at 439. We granted review of these consolidated cases. *State v. Houston-Sconiers*, 185 Wn.2d 1032, 377 P.3d 737 (2016).

ANALYSIS

I.  THE EVIDENCE WAS SUFFICIENT TO PROVE SECOND DEGREE ASSAULT OF A.G.

Petitioners were convicted of one count each of second degree assault of A.G. in violation of RCW 9A.36.021(1)(c). One of the elements of assault as charged

10

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

here is that the act is "done with the intent to create in another apprehension and fear of bodily injury, and . . . *in fact* creates in another a reasonable apprehension and imminent fear of bodily injury . . . ." CPHS at 183 (emphasis added) (Instr. 33).[1]

Petitioners contend that the State failed to prove that A.G. "[i]n fact" experienced "'reasonable apprehension and imminent fear of bodily injury.'" Suppl. Br. of Pet'r at 9-10. They point to A.G.'s actions in hiding—rather than handing over—her bag of candy as she walked away from the robbery, as well as her testimony regarding her feelings after the event. Petitioners further argue that the Court of Appeals erred in ruling that A.G.'s fear could be inferred from the mere presence of a firearm, when A.G.'s words and actions indicate she experienced no such fear. Suppl. Br. of Pet'r at 10; Shortened Suppl. Br. on behalf of Pet'r Treson Roberts at 4.

In reviewing convictions for sufficiency of the evidence, we ask "whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992) (citing *State v. Green*, 94 Wn.2d 216, 220-22, 616 P.2d 628 (1980) (plurality opinion)). The challenge "admits the truth of the

---

[1] Because "assault" is not defined by statute, Washington courts look to the common law definition. *See State v. Elmi*, 166 Wn.2d 209, 215, 207 P.3d 439 (2009).

State's evidence and all inferences that reasonably can be drawn therefrom," *id.*, and leaves determinations of witness credibility to the fact finder, *State v. Drum*, 168 Wn.2d 23, 35, 225 P.3d 237 (2010) (citing *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990)).

We need not address whether presence of a firearm alone suffices to prove the apprehension element of assault. Here, there was more. A.G. testified that as her friends were being robbed, she went to the nearest house for help. 11 VRP (July 15, 2013) at 825-26. As discussed above, she said that the events affected her confidence and manner at that particular house and she agreed with counsel for Houston-Sconiers that the group of friends as a whole were "[r]eally scared." *Id.* at 852, 859.[2] Viewing this evidence in the light most favorable to the State, a rational fact finder could determine that A.G. took these actions out of fear that she would

---

[2] On cross-examination by counsel for Houston-Sconiers, A.G.'s testimony went as follows:

Counsel: No one was hurt?
A.G.: No.
Counsel: Really scared, but hurt [*sic*]?
A.G.: Yeah.

11 VRP (July 15, 2013) at 859. Petitioners assert that A.G.'s testimony indicates that the only thing she feared was calling the police. *Id.* at 856, 860. But even if this is a plausible interpretation of A.G.'s statements, there are other plausible interpretations. A reasonable jury could interpret this exchange as evidence that A.G. feared harm from Houston-Sconiers.

12

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 92605-1

be harmed. The evidence was therefore sufficient to support the two assault convictions.

## II. THE EVIDENCE WAS SUFFICIENT TO SUPPORT THE FIREARM ENHANCEMENTS ON THE CONSPIRACY CONVICTIONS

Petitioners were also convicted of conspiracy to commit robbery in the first degree in violation of RCW 9A.28.040(1), along with a firearm sentence enhancement on that conviction. They challenge this firearm enhancement for two reasons: first, that it is illogical to impose firearm sentence enhancements on *any* charge of conspiracy because conspiracy is just an agreement, not an act, and second, that the agreement here to use a firearm in the future is insufficient to support the firearm sentence enhancements on the conspiracy charges.

The first challenge fails because conspiracy is not just an agreement—it's an agreement to commit a crime plus "a substantial step in pursuance of such agreement." RCW 9A.28.040(1); *see also State v. Dent*, 123 Wn.2d 467, 475, 869 P.2d 392 (1994) (quoting *Yates v. United States*, 354 U.S. 298, 334, 77 S. Ct. 1064, 1 L. Ed. 2d 1356 (1957), *overruled on other grounds by Burks v. United States*, 437 U.S. 1, 2, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978)). Obtaining or brandishing a gun can certainly be considered such a substantial step.

The first challenge also fails because the legislature intended to enhance conspiracy sentences if a firearm was used. RCW 9.94A.533 specifically describes

13

how to apply firearm enhancements to sentences for conspiracy and other inchoate crimes, demonstrating that the legislature contemplated this situation. *See* RCW 9.94A.533(3).

The petitioners' second argument on this point is that the evidence was insufficient to support the required nexus between the firearm and the conspiracy. That nexus requirement is rooted in the firearm enhancement statute, our constitution, and our case law. The firearm statute increases the sentence for an underlying felony "if the offender or an accomplice was armed with a firearm" during the course of that crime. RCW 9.94A.533(3). To prove that a defendant is "armed," the State must show that "'he or she is within proximity of an easily and readily available deadly weapon for offensive or defensive purposes and [that] a nexus is established between the defendant, the weapon, and the crime.'" *State v. O'Neal*, 159 Wn.2d 500, 503-04, 150 P.3d 1121 (2007) (quoting *State v. Schelin*, 147 Wn.2d 562, 575-76, 55 P.3d 632 (2002) (plurality opinion)). Such a nexus exists when the defendant and the weapon are "in close proximity" at the relevant time. *State v. Gurske*, 155 Wn.2d 134, 141-42, 118 P.3d 333 (2005). Sufficient evidence of nexus exists "[s]o long as the facts and circumstances support an inference of a connection between the weapon, the crime, and the defendant." *State v. Easterlin*, 159 Wn.2d 203, 210, 149 P.3d 366 (2006).

14

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 92605-1

The State proved such a nexus here. It charged petitioners with a conspiracy occurring on October 31, 2012. CPHS at 21; CPR at 19. Both the agreement and the crime itself—including its "substantial steps"—occurred on that day. There is also circumstantial evidence that petitioners had access to the firearm at the very time they made the agreement to commit robbery. Based on witness testimony at trial, a rational fact finder could infer that petitioners, having taken the gun that L.A. saw in their possession at Roberts's house, made the agreement to commit armed robbery at some point between their arrival at Stanley Elementary School and their commission of the first robbery. This would put petitioners "within proximity of an easily and readily available deadly weapon," *O'Neal*, 159 Wn.2d at 503-04, with the weapon available for offensive or defensive use at the time they made the agreement itself. The evidence was sufficient to support these two firearm enhancements.

III. TRIAL COURTS HAVE FULL DISCRETION TO IMPOSE SENTENCES BELOW SRA GUIDELINES AND/OR STATUTORY ENHANCEMENTS BASED ON YOUTH

A. The Eighth Amendment Requires Sentencing Courts To Consider the Mitigating Qualities of Youth at Sentencing, Even in Adult Court

Petitioners argue that children are different from adults. They conclude that those differences render their mandatory transfer to adult court, their lengthy adult

15

sentences, and their mandatory, consecutive, flat time firearm enhancements unlawful.[3]

They have considerable support for their arguments. The Supreme Court's recent decisions explicitly hold that the Eighth Amendment to the United States Constitution compels us to recognize that children are different. *E.g.*, *Miller*, 132 S. Ct. at 2470 ("children are different"); *Graham*, 560 U.S. at 68-70 (differences between children and adults are constitutional in nature and implicate Eighth Amendment and sentencing practices); *Roper v. Simmons*, 543 U.S. 551, 569-70, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005).

The Supreme Court has already applied that holding about the differences between children and adults in several specific contexts: the death penalty, *Roper*, 543 U.S. at 574; life without parole sentences for nonhomicide offenses, *Graham*, 560 U.S. at 79; mandatory life without parole sentences for any offense, *Miller*, 132 S. Ct. at 2469; and confessions, *J.D.B. v. North Carolina*, 564 U.S. 261, 277, 131 S. Ct. 2394, 180 L. Ed. 2d 310 (2011).

---

[3] The concurrence is correct that we generally avoid constitutional questions when the case can be decided on nonconstitutional grounds. Concurrence at 1. There are, however, two reasons to address the constitutional issue in this case. First, the parties briefed and argued it solely on constitutional grounds. Second, the concurrence would overturn prior precedent on how to interpret a statute, but the best reason to interpret the statutory language as the concurrence does is constitutional avoidance, that is, to avoid the constitutional problem we identify here.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 92605-1

Critically, the Supreme Court has also explained how the courts must address

those differences in order to comply with the Eighth Amendment: with discretion

to consider the mitigating qualities of youth.[4]

---

[4] *Roper*, in 2005, reversed prior precedent to invalidate the juvenile death penalty under the Eighth Amendment, holding that the "diminished culpability" of juveniles dampened its penological justifications and rendered the punishment unconstitutionally disproportionate for youth. 543 U.S. at 571. This diminished culpability results from three key differences between youth and adults identified by the *Roper* Court: a "'lack of maturity and an underdeveloped sense of responsibility'" that frequently leads to "'impetuous and ill-considered actions and decisions'"; an increased susceptibility to "negative influences and outside pressures," including a reduced ability to control or escape their environments; and a "more transitory, less fixed" character that is "not as well formed as that of an adult." *Id.* at 569-70 (quoting *Johnson v. Texas*, 509 U.S. 350, 367, 113 S. Ct. 2658, 125 L. Ed. 2d 290 (1993)). In 2010, relying on these three differences, as well as on emerging developments in juvenile brain science and psychology, the Court struck down life without parole sentences for juvenile nonhomicide offenders. *Graham*, 560 U.S. at 74. Two years later, the Court extended *Graham*'s reasoning to encompass mandatory life sentences for any crime committed by a juvenile if there was no opportunity to consider, at sentencing, "an offender's youth and attendant characteristics." *Miller*, 132 S. Ct. at 2471. *Miller* affirmed *Graham*'s declaration that "'[age] is relevant to the Eighth Amendment'" and thus that "'criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed.'" *Id.* at 2466 (quoting *Graham*, 560 U.S. at 76).

In each case, the Court found that legitimate penological goals failed to justify the sentences being invalidated as applied to youth. It noted that the goal of retribution was diminished because *Roper*'s three key differences between children and adults made children less blameworthy at sentencing. *Id.* at 2465. Likewise, the "immaturity, recklessness, and impetuosity" of youth diminished the goal of deterrence. *Id.* And the penological goals of rehabilitation and incapacitation were incompatible with mandatory, lengthy sentences for juveniles because of their inherent "capacity for change." *Id.*

These cases make two substantive rules of law clear: first, "that a sentencing rule permissible for adults may not be so for children," *id.* at 2470, rendering certain sentences that are routinely imposed on adults disproportionately too harsh when applied to youth,

17

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 92605-1

Further, the Eighth Amendment requires trial courts to exercise this discretion whether the youth is sentenced in juvenile or adult court and whether the transfer to adult court is discretionary or mandatory. *Miller*, 132 S. Ct. at 2461-62 (appellants Jackson and Miller both had benefit of discretionary transfer hearing; rule barring mandatory life without parole sentence or juvenile death penalty for capital murder still applied to them); *Graham*, 560 U.S. at 53 (Graham was charged as an adult, at prosecutor's discretion); *Roper*, 543 U.S. at 557 (Simmons was tried as an adult following mandatory transfer).

Critically, the Eighth Amendment requires trial courts to exercise this discretion at the time of sentencing itself, regardless of what opportunities for discretionary release may occur down the line. *See, e.g.*, *Miller*, 132 S. Ct. at 2468-72 (listing reasons why certain mitigating factors had to be considered at the time of child's initial sentencing); *Graham*, 560 U.S. at 69-70 (Eighth Amendment bars imposition of life without parole sentence on juvenile nonhomicide offender, despite the fact that Graham might be eligible for executive clemency). Indeed, the only time the Supreme Court has spoken approvingly of a postsentencing *Miller* "fix" such as extending parole eligibility to juveniles is when addressing how to remedy

---

and second, that the Eighth Amendment requires another protection, besides numerical proportionality, in juvenile sentencings—the exercise of discretion.

18

a conviction and sentence that were long final. *Montgomery v. Louisiana*, __ U.S. __, 136 S. Ct. 718, 736, 193 L. Ed. 2d 599 (2016). Roberts's and Houston-Sconiers's convictions are on appeal; they are not even final.

To be sure, the Supreme Court has not applied the rule that children are different and require individualized sentencing consideration of mitigating factors in exactly this situation, i.e., with sentences of 26 and 31 years for Halloween robberies. But we see no way to avoid the Eighth Amendment requirement to treat children differently, with discretion, and with consideration of mitigating factors, in this context.

The sentencing judge did not do that here. Indeed, he believed that he was precluded from exercising discretion. Addressing Houston-Sconiers, the sentencing judge stated:

> [Judges] don't have the discretion we had 30 years ago in terms of sentencing.
>
> And it frustrates me because as I'm sitting here, I wouldn't tell you I wouldn't exercise more discretion in your favor if I had that opportunity to do so. But the law is an oath that I took to enforce. And in this particular case, I don't have any option because if I did do something different than what the law requires me to do, it would simply be overturned by another court, and we'd be back here for resentencing.

25 VRP (Sept. 13, 2013) at 2401-02. Later, addressing Roberts, the judge continued:

19

> The only mercy I have has already been executed by the prosecutor in recommending a zero sentence on the underlying crimes. . . .
>
> Three-hundred and twelve months [on the firearm sentence enhancements] is what I'm compelled to sentence you to . . . .

*Id.* at 2418.

Even the State contended that its recommendation for a sentence below the SRA range, while just, was technically illegal. CPHS at 227. The judge agreed. 25 VRP (Sept. 13, 2013) at 2418.

We disagree. In accordance with *Miller*, we hold that sentencing courts must have complete discretion to consider mitigating circumstances associated with the youth of any juvenile defendant, even in the adult criminal justice system, regardless of whether the juvenile is there following a decline hearing or not. To the extent our state statutes have been interpreted to bar such discretion with regard to juveniles,[5] they are overruled. Trial courts must consider mitigating qualities of youth at sentencing and must have discretion to impose any sentence below the otherwise applicable SRA range and/or sentence enhancements.[6]

---

[5] *Cf. State v. Brown*, 139 Wn.2d 20, 29, 983 P.2d 608 (1999) (holding that trial courts lack discretion to run sentence enhancements concurrently, even as an exceptional sentence; no separate discussion of juveniles).

[6] Petitioners also argue, in supplemental briefing, that imposing a lengthy term of years sentence on a juvenile without possibility of discretion violates article I, section 14,

20

## B. Our Holding Is Not Affected by Subsequent Legislative Enactments That Allow Petitions for Early Release

In 2014, the legislature passed an act to allow inmates who are serving sentences for crimes committed as a juvenile to petition for early release after serving 20 years. *See* LAWS OF 2014, ch. 130, § 10 (codified at RCW 9.94A.730). The following year, the legislature amended the firearm enhancement statute at issue in this case to allow inmates sentenced under that statute to petition for early release under the 2014 act. *See* LAWS OF 2015, ch. 134, § 6. The State contends that these enactments satisfy the requirements of *Miller* in this case and relieve us from reaching the question of whether petitioners' lengthy, mandatory sentences violate *Miller*. Suppl. Br. of Resp't at 19.

We disagree for two reasons. First, there has been no showing that the legislature intended the *Miller* fix to be the exclusive means of taking youth into account in sentencing. In fact, in *In re Personal Restraint of McNeil*, we determined that the opportunity to petition for early release under a *Miller* fix statute did not conclusively resolve McNeil's *Miller* claim. 181 Wn.2d 582, 589, 334 P.3d 548

of our state constitution. This is a question of first impression before this court. However, because this issue was not raised or decided in the courts below, we decline to address it at this time.

21

(2014). This was because the *Miller* fix was just one possible remedy for McNeil on postconviction review.

Second, *Miller* is mainly concerned with what must happen at sentencing because *Miller*'s holding rests on the insight that youth are generally less culpable *at the time of their crimes* and culpability is of primary relevance in sentencing. *See Miller*, 132 S. Ct. at 2464. But the part of the *Miller* fix statute that is applicable to this case, RCW 9.94A.730, prioritizes public safety considerations and likelihood of recidivism. It makes no allowance for consideration of any of the mitigating factors of youth that *Miller* requires at the time of sentencing. The fact that a recently enacted statute may offer the possibility of another remedy in the future, or on collateral review, does not resolve whether petitioners' sentences are unconstitutional and in need of correction now, and it does not provide for the consideration of mitigating factors to which they are entitled now, while their convictions are still not yet final. Indeed, the Supreme Court recognized that even Graham (of *Graham v. Florida*) might ultimately be eligible for executive clemency; it nevertheless held, on direct appeal, that his life without parole sentence was unconstitutional. *Graham*, 560 U.S. at 69-70. Statutes like RCW 9.94A.730 may provide a remedy on collateral review, *Montgomery*, 136 S. Ct. at 736, but they do

22

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

not provide sentencing courts with the necessary discretion to comply with constitutional requirements in the first instance.

*Miller* requires such discretion and provides the guidance on how to use it. It holds that in exercising full discretion in juvenile sentencing, the court must consider mitigating circumstances related to the defendant's youth—including age and its "hallmark features," such as the juvenile's "immaturity, impetuosity, and failure to appreciate risks and consequences." *Miller*, 132 S. Ct. at 2468. It must also consider factors like the nature of the juvenile's surrounding environment and family circumstances, the extent of the juvenile's participation in the crime, and "the way familial and peer pressures may have affected him [or her]." *Id.* And it must consider how youth impacted any legal defense, along with any factors suggesting that the child might be successfully rehabilitated. *Id.*

This is what the sentencing court should have done in this case, and this is what we remand for it to do.

### C. The SRA Allows Sentencing Courts To Consider the Mitigating Qualities of Youth at Sentencing, Even in Adult Court

Our Eighth Amendment holding certainly prevails over any statutes to the contrary. We emphasize, however, that we do not read our state statutes as contrary to our Eighth Amendment holding. In *State v. O'Dell*, 183 Wn.2d 680, 688-89, 358 P.3d 359 (2015), we held that a sentencing court may consider a defendant's youth

23

as a mitigating factor justifying an exceptional sentence below the sentencing guidelines under the SRA. The trial court in this case did not have the benefit of the *O'Dell* decision at the time of petitioners' sentencing, and that accounts for its belief that its exceptional sentence below the SRA range on the case crimes was technically illegal under state law. We clarify that it was not. *O'Dell* makes clear that the exceptional sentences of zero incarceration on the base substantive offenses that the State proposed and the court accepted in this case were lawful, based on petitioners' youth at the time of the crimes.

> D. The Enhancement Statutes Do Not Bar Sentencing Courts from Considering the Mitigating Qualities of Youth at Sentencing, Even in Adult Court

The enhancement statutes, when read together with our juvenile jurisdiction statutes, do not conflict with this result, either. In *State v. Furman*, 122 Wn.2d 440, 457-58, 858 P.2d 1092 (1993), this court addressed a similar interaction between a juvenile court statute and an adult sentencing statute: RCW 13.40.110, which permitted the juvenile court to decline jurisdiction and thereby send a juvenile offender to adult court, and RCW 10.95.080, which authorized the death penalty for aggravated murder. We noted that a rigid reading of this statutory scheme would allow execution of children as young as eight years old. But that reading would violate United States Supreme Court precedent barring death sentences for children

24

who committed their crimes before age 16. *Furman*, 122 Wn.2d at 457-58. We held, "'[I]t is the duty of this court to construe a statute so as to uphold its constitutionality.'" *Id.* at 458 (internal quotation marks omitted) (quoting *World Wide Video, Inc. v. Tukwila*, 117 Wn.2d 382, 392, 816 P.2d 18 (1991)). We therefore held those statutes' silence about whether they were meant to cross-reference each other could not be read as silent authorization to impose that harsh penalty on all children.[7] *Id.* ("RCW 13.40.110 authorizes juveniles to be tried as adults, but does not mention the death penalty. RCW 10.95 authorizes imposition of the death penalty, but does not refer to crimes committed by juveniles. Most critically, neither statute sets any minimum age for imposition of the death penalty."), 459 (Utter, J., concurring) ("I concur in the majority's holding that there exists no authority under the statute to execute juveniles.")

The same logic applies here. We have upheld statutes like the one at issue in this case, RCW 13.04.030(1)(e)(v)(C), which "authorizes juveniles to be tried as adults, but does not mention [firearm or other sentence enhancements]." *Furman*,

---

[7] *Furman*, 122 Wn.2d at 458 ("We cannot rewrite the juvenile court statute or the death penalty statute to expressly preclude imposition of the death penalty for crimes committed by persons who are under age 16 and thus exempt from the death penalty under *Thompson* [*v. Oklahoma*, 487 U.S. 815, 857-58, 1108 S. Ct. 2687, 101 L. Ed. 2d 702 (1988)]. Nor is there any provision in either statute that could be severed in order to achieve that result. The statutes therefore cannot be construed to authorize imposition of the death penalty for crimes committed by juveniles." (footnote omitted)).

25

122 Wn.2d at 458. We have also held that our firearm enhancement statutes require a sentencing court to impose separate sentence enhancements consecutive to the substantive crime and to other enhancements for each firearm or deadly weapon used, but without referring to juveniles. *State v. DeSantiago*, 149 Wn.2d 402, 416, 420-21, 68 P.3d 1065 (2003). This means that the "enhancement" portion of a sentence—the portion that is absolutely mandatory, from which the trial court has no discretion to depart—may be as long as or even vastly exceed the portion imposed for the substantive crimes,[8] reaching lengths of 50 years or more.[9] The mandatory nature of these enhancements violates the Eighth Amendment protections discussed above. *See also Casiano v. Comm'r of Corr.*, 317 Conn. 52, 75, 115 A.3d 1031 (2015) (court may not impose 50-year sentence on juvenile offender without exercising *Miller* discretion), *cert. denied*, 136 S. Ct. 1364 (2016); *State v. Null*, 836 N.W.2d 41, 73-74 (Iowa 2013) (52.5 year sentence triggered *Miller*'s protections); *Bear Cloud v. State*, 2014 WY 113, 334 P.3d 132, 141 ("the teachings of the

---

[8] *State v. Statler*, 160 Wn. App. 622, 630, 248 P.3d 165 (2011) (base sentence of 138 months (11.5 years); firearm enhancements of 360 months (36 years)).

[9] *E.g.*, *State v. Korum*, 157 Wn.2d 614, 622, 141 P.3d 13 (2006) (plurality opinion) (base sentence of 608 months (50.67 years); firearm enhancements of 600 months (50 years)); *see also* S.B. REP. ON SUBSTITUTE H.B. 1148, at 23, 64th Leg., Reg. Sess. (Wash. 2015) (describing case in which defendant with no prior convictions who waited in car while accomplices perpetrated home invasion robbery involving several guns received an 83-year sentence due to firearm enhancements).

*Roper/Graham/Miller* trilogy" require remand for resentencing on 45-year mandatory concurrent sentence). This violation, just like the violation discussed in *Furman*, results from the interaction of two distinct statutes that contain no explicit reference to the other. Here, as in *Furman*, we cannot conclude that our legislature intended this result.

### E. Petitioners' Challenge To Our Decision in *In re Boot*

Petitioners also argue that we should overrule *In re Boot*, 130 Wn.2d 553, 925 P.2d 964 (1996), and declare the automatic decline statute, RCW 13.04.030(1)(e)(v), unconstitutional. They are correct that some of our discussion in *Boot* stands in tension with the Supreme Court's holdings in *Roper*, *Graham*, and *Miller*.

Petitioners, however, made this argument in the court below to address the length of their sentences—not the proper court to impose those sentences. In fact, in the Court of Appeals, petitioners requested the relief of resentencing to a juvenile sentence—but in adult court. Indeed, they appear to agree that, four years past their 16th and 17th birthdays, this case should be remanded to adult court for resentencing. *See* Opening Br. of Appellant Roberts at 16, 18; Opening Br. of

27

Appellant Houston-Sconiers at 47-48 (incorporating Roberts's argument by reference).[10]

This is essentially the relief that our Eighth Amendment holding accords them today. Because we invalidate petitioners' sentences on these grounds, we decline to address the validity of the automatic decline statute at this time.[11]

## IV. THE COURT OF APPEALS CORRECTLY DENIED HOUSTON-SCONIERS'S PRP

Finally, we consider Houston-Sconiers's PRP, which was consolidated with this case by the Court of Appeals. Houston-Sconiers raises claims regarding his pretrial motion to suppress evidence, his right to be present at all critical stages of his trial, his right to a missing witness instruction, and prosecutorial misconduct. We affirm the Court of Appeals' decision to deny those claims.

---

[10] Petitioners make this same limited argument in their petitions for review. They did make slightly different arguments after we granted review, as do amici. But the court below did not have a chance to address them.

[11] At oral argument, counsel for amicus contended that we should overrule *Boot* and strike down the automatic decline statute because it violates the constitutional principle that, as a matter of due process, "children have a right not to be automatically treated as adults." Wash. Supreme Court oral argument, *State v. Houston-Sconiers*, No. 92605-1 (Oct. 18, 2016), at 23 min., 15 sec., *audio recording by* TVW, Washington State's Public Affairs Network, http://www.tvw.org. Although we decline to rule on the merits of this argument at this time, we do not intend to foreclose consideration of such an argument in the future.

A. The Trial Court Correctly Denied the Motion To Suppress

Before trial, Houston-Sconiers moved to suppress the evidence found in the green Cadillac and proffered testimony from Worthey's son in support of that motion. 6 VRP (June 27, 2013) at 223. According to defense counsel, Worthey's son would have testified that he owned the car and gave the boys permission to use it. *Id*. The trial court denied the request to hear Worthey's son's testimony. It ruled that even if Worthey's son were the vehicle's true owner, Worthey still had authority to consent to the search of her property, including the inoperable vehicles on it. *Id*. at 244-47.

Washington courts recognize the "common authority rule," according to which more than one person may have the authority to consent to the search of shared property. *State v. Morse*, 156 Wn.2d 1, 7, 123 P.3d 832 (2005). The trial court here concluded that Worthey had at least some authority over the vehicle parked in her yard—a vehicle that had been parked there, inoperable, for at least a year before the time of the search—and that this authority was sufficient to reduce others' reasonable expectations of privacy in that vehicle. 6 VRP (June 27, 2013) at 245. This is consistent with our application of the common authority rule. *Morse*, 156 Wn.2d at 7-8.

No. 92605-1

### B. The Record Does Not Support Houston-Sconiers's Claim That He Was Denied the Right To Presence

Houston-Sconiers contends he was absent from two critical court proceedings: (1) a session of jury selection on the morning of July 8, 2013, and (2) a "hearing [later that same day] on whether or not [defense] counsel would be able to continue due to [an] injury." PRP at 13-14 (citing 7 VRP (July 8, 2013) at 257-71 (citing 8 VRP (July 9, 2013) at 279-80). He argues that this violated his right to presence at trial. *Id.* at 12.

The record does not support this claim. It shows that some voir dire occurred on the morning of July 8, but there is no indication that Houston-Sconiers was absent from these proceedings. 7 VRP (July 8, 2013) at 259-71. This defeats the first part of his claim. *State v. Koss*, 181 Wn.2d 493, 503-04, 334 P.3d 1042 (2014) (appellant bears the burden of providing record adequate to show that claimed error occurred).

The next part of Houston-Sconiers's claim relies on the transcript from the following day. 8 VRP (July 9, 2013) at 275. There, the trial court made a record of what occurred on the afternoon of July 8. *Id.* at 275-78. It indicates that defense counsel called the court on the afternoon of July 8 to say that she had struck her knee on a filing cabinet and needed to go to the hospital. *Id.* at 275. Per the court's instructions, defense counsel called in later that day with an update on her condition. She said that she would not be able to come to court that afternoon. *Id.* at 276. So

30

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

the court cancelled the afternoon's proceedings. *Id.* Houston-Sconiers was not present for either telephone conversation. *Id.* at 275-79. When defense counsel returned to court the following day (July 9), she noted Houston-Sconiers's own objection to "the Court proceeding with the hearing in his absence." *Id.* at 279. The court ruled that Houston-Sconiers's right to presence was not violated because the hearing did not involve any substantive issues. *Id.* at 280.

The trial court was correct. A criminal defendant has a fundamental right to presence at all "critical stages of a trial." *State v. Irby*, 170 Wn.2d 874, 880-81, 246 P.3d 796 (2011) (citing *Rushen v. Spain*, 464 U.S. 114, 117, 104 S. Ct. 453, 78 L. Ed. 2d 267 (1983)). A "critical stage" is one at which the defendant's presence "'has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.'" *Id.* at 881 (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105-06, 54 S. Ct. 330, 78 L. Ed. 674 (1934)). The conversations that took place in Houston-Sconiers's absence dealt exclusively with defense counsel's knee and what to do about it. This did not constitute a "critical stage" to which the right to presence attaches.

### C. The Trial Court Did Not Err in Denying Houston-Sconiers's Requested Missing Witness Instruction

Before Officer Rodney Halfhill testified, Houston-Sconiers moved for a court order preventing the prosecutor from eliciting testimony about what victim Wright

told Halfhill regarding the robberies. PRP at 15 (citing 12 VRP (July 16, 2013) at 1044). The trial court denied the motion because Wright's statements fell within the excited utterance exception to the hearsay rule and presented no confrontation clause problem. 12 VRP (July 16, 2013) at 1061-64; U.S. CONST. amend. VI. Houston-Sconiers argues that by failing to give a missing witness instruction regarding Wright, the trial court shifted the burden of proof to the defense. PRP at 6, 14, 17.

The Court of Appeals rejected a similar argument made on appeal because it determined after a detailed analysis that Wright's statements were nontestimonial. *State v. Houston-Sconiers*, No. 45374-6-II, slip op. at 20-22 (Wash. Ct. App. Nov. 24, 2015), http://www.courts.wa.gov/opinions/pdf/45374-6.15.pdf. In his PRP, Houston-Sconiers does not argue that Wright's statements were testimonial—instead, he argues only that he was entitled to a missing witness instruction regarding Wright. PRP at 17. But he cites no authority in support of this argument. A missing witness instruction is appropriate when the witness is "particularly under the control of [one party] rather than being equally available to both parties." *State v. Montgomery*, 163 Wn.2d 577, 598-99, 183 P.3d 267 (2008). The record indicates that the trial court issued a material witness warrant for James Wright but that neither party knew whether he would appear. 12 VRP (July 16, 2013) at 1044. It does not indicate that he was particularly available to the State.

32

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

> D. Houston-Sconiers Does Not Meet His Burden To Show
> Prosecutorial Misconduct

Houston-Sconiers contends that the prosecutor committed misconduct in seven different ways. I address each claim separately.

First, Houston-Sconiers argues that the prosecuting attorney overcharged him and refused to reduce the charges because he believed that Houston-Sconiers came from a bad family. PRP at 18 (citing App. to PRP (declaration of trial defense counsel Barbara Corey)). And Houston-Sconiers presents evidence in support of this claim: his lawyer's declaration that the deputy prosecutor in charge of the case explicitly told her that he would not reduce the charges because the client was from a "bad family," and that the deputy prosecutor said this to her personally as well as to both her and Houston-Sconiers together when the three of them met. *Id.* He appears to argue that the prosecutor's charging decision warrants reversal of his conviction.

There are certainly constitutional limits on the prosecutor's charging discretion. "In particular, the decision to prosecute may not be 'deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification,' including the exercise of protected statutory and constitutional rights." *Wayte v. United States*, 470 U.S. 598, 608, 105 S. Ct. 1524, 84 L. Ed. 2d 547 (1985) (citation and internal quotation marks omitted) (quoting *Bordenkircher*

*v. Hayes*, 434 U.S. 357, 364, 98 S. Ct. 663, 54 L. Ed. 2d 604 (1978)). But Houston-Sconiers has not briefed this issue or how that would apply to a decision based on a defendant's family. We therefore decline to address that question here.

Second, Houston-Sconiers argues that the prosecutor committed misconduct by implying that defense counsel was dishonest. PRP at 18 (citing 8 VRP (July 9, 2013) at 302). He cites the prosecutor's comments during a hearing outside the presence of the jury on a defense motion to dismiss. 8 VRP (July 9, 2013) at 289-302. But as Houston-Sconiers notes in his PRP, to obtain relief for prosecutorial misconduct, a defendant must show a substantial likelihood that the misconduct affected the jury's verdict. PRP at 20; *State v. Thorgerson*, 172 Wn.2d 438, 452, 258 P.3d 43 (2011). There is no possibility that the prosecutor's comments during the hearing that occurred outside the jury's presence affected the jury's verdict.

Third, Houston-Sconiers argues that the prosecutor committed misconduct warranting reversal when he pointed out that certain witnesses did not come to court. PRP at 18 (citing 23 VRP (Aug. 1, 2013) at 2240). With respect to this allegation, Houston-Sconiers cites a portion of closing argument during which the prosecutor noted that Treson Roberts's mother did not testify. 23 VRP (Aug. 1, 2013) at 2240. In fact, the prosecutor mentioned this missing testimony at several different points during closing arguments and defense counsel objected each time. *Id.* at 2240, 2347,

34

2355. The trial court sustained the final objection. *Id.* at 2355. Given these objections, the defendant must prove "both that the prosecutor made improper statements and that . . . [there is] a substantial likelihood that the prosecutor's statements affected the jury's verdict" to prevail. *State v. Lindsay*, 180 Wn.2d 423, 440, 326 P.3d 125 (2014) (citing *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012)). Houston-Sconiers has not attempted to meet that burden here.

Fourth, Houston-Sconiers claims that the prosecutor misstated the evidence and argued facts not in evidence. PRP at 18 (citing 23 VRP (Aug. 1, 2013) at 2239, 2340-41, 2343, 2350). He cites several pages from the transcript, but does not explain how those comments misstate the evidence. With the exception of the first citation, the record contains no contemporaneous objections. As with the previous claim (regarding Roberts's mother), Houston-Sconiers does not explain how these allegedly improper statements affected the verdict.

Fifth, Houston-Sconiers argues that the prosecutor committed misconduct warranting reversal when he suggested that witnesses were covering for the defendants because black people observe "a snitch code," and used "racial words such as 'n*****.'" PRP at 18 (citing 23 VRP (Aug. 1, 2013) at 2347, 2348, 2350). Of the three transcript pages Houston-Sconiers cites, only one contains explicit "racial words" and references to snitching: there, the prosecutor comments that

35

Houston-Sconiers was "so incredibly unlucky that he chose to make phone calls to his buddies and say niggas be snitching." 23 VRP (Aug. 1, 2013) at 2350. Houston-Sconiers relies on *State v. Monday*, 171 Wn.2d 667, 257 P.3d 551 (2011), to support this argument, but *Monday* is distinguishable. There, the prosecutor made racially inflammatory arguments, based on stereotypes rather than evidence, to discredit black witnesses who would not provide the testimony the State sought. *Id.* at 678. In this case, the prosecutor quoted Houston-Sconiers's own words, in which he apparently acknowledged committing the charged crimes, in order to refute the defense theory that he had been framed. *See Houston-Sconiers*, slip op. at 49; 23 VRP (Aug. 1, 2013) at 2307.

Sixth, Houston-Sconiers claims the prosecutor committed misconduct warranting reversal when he used two pieces of evidence, the Halloween mask and gun, and had the courtroom lights dimmed to illustrate the scene of the crimes. PRP at 18 (citing 13 VRP (July 17, 2013) at 1190-1212). In the portion of the transcript that Houston-Sconiers cites here, the State sought to illustrate the fact that a witness could have misidentified the color of the gun used in the robbery. 13 VRP (July 17, 2013) at 1192-94. To do this, the State asked to dim the courtroom lights and proceeded to question a witness about what features of the gun might be visible, from a distance, through the mesh eyeholes of a mask the victim wore. *Id.* at 1190-

92. The defense objected, and, after hearing extensive argument and recessing to conduct its own research, the court instructed the jury that it should consider the "hypothetical" for illustrative purposes only. *Id.* at 1192-1212. Houston-Sconiers does not cite any authority or offer any reasoning to explain why the trial court erred. He simply asserts that the prosecutor's use of the mask, gun, and dimmed lighting "inflam[ed] the jury[] to be biased against Houston-Sconiers." PRP at 20. This is not sufficient to meet his burden to show error and resulting prejudice.

Finally, Houston-Sconiers argues that the prosecutor committed reversible misconduct when he said he was advocating on the public's behalf. *Id.* at 18. Houston-Sconiers offers no citation—either to the record or to case law—to support this argument.

Accordingly, we affirm the Court of Appeals' decision to deny Houston-Sconiers's PRP.

## CONCLUSION

We hold that in sentencing juveniles in the adult criminal justice system, a trial court must be vested with full discretion to depart from the sentencing guidelines and any otherwise mandatory sentence enhancements, and to take the particular circumstances surrounding a defendant's youth into account. We affirm

Houston-Sconiers's and Roberts's convictions, but we reverse their sentences and

remand for resentencing in accordance with this opinion.

_[signature]_ González, J.

WE CONCUR:

_[signature]_ Fairhurst, C.J.

_[signature]_ Owens, J.

_[signature]_ Stephens, J.

_[signature]_ Wiggins, J.

_[signature]_ González, J.

_[signature]_ Yu, J.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Houston-Sconiers (Zyion), et al.*

No. 92605-1

MADSEN, J. (concurring in result only)—The majority relies on the Eighth Amendment to the United States Constitution to find that the sentencing court in these consolidated cases had the discretion to impose an exceptional sentence downward based on Zyion Houston-Sconiers' and Treson Roberts' youth. I would resolve this case on different, nonconstitutional grounds.[1] In my view, the discretion vested in sentencing courts under the Sentencing Reform Act of 1981 (SRA) includes the discretion to depart from the otherwise mandatory sentencing enhancements when the court is imposing an exceptional sentence. Ch. 9.94A RCW. Because the sentencing court failed to recognize that it had such discretion, it abused its discretion. I would therefore reverse and remand for resentencing.

I recognize that this court has held that sentencing courts do not have the discretion to depart from mandatory firearm sentencing enhancements because of the legislature's "absolute language." *State v. Brown*, 139 Wn.2d 20, 29, 983 P.2d 608 (1999). But in the 18 years since the *Brown* decision, I have maintained my position that this court wrongly deprived sentencing judges of the discretion expressly provided to

---

[1] An appellate court should decline to consider constitutional issues where it can decide the case on nonconstitutional grounds. *HJS Dev., Inc. v. Pierce County*, 148 Wn.2d 451, 469 n.75, 61 P.3d 1141 (2003).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 92605-1
Madsen, J., concurring in result only

them under the SRA in order to fulfill the purposes of that act. And our cases in recent years have continued to recognize the discretion that sentencing courts have for otherwise mandatory sentences when they are imposing exceptional sentences. This case provides an illustrative example of exactly why we erred in *Brown* and an opportunity for us to align firearm enhancements with the rest of our sentencing jurisprudence.

In enacting the SRA, the legislature set forth its purposes, emphasizing the importance of maintaining judicial discretion in sentencing:

> The purpose of this chapter is to make the criminal justice system accountable to the public *by developing a system for the sentencing of felony offenders which structures, but does not eliminate, discretionary decisions affecting sentences*, and to:
> (1) Ensure that the punishment for a criminal offense is *proportionate* to the seriousness of the offense and the offender's criminal history;
> (2) Promote respect for the law by providing punishment which is *just*;
> (3) Be *commensurate* with the punishment imposed on others committing similar offenses;
> (4) Protect the public;
> (5) Offer the offender an opportunity to improve himself or herself;
> (6) Make frugal use of the state's and local governments' resources; and
> (7) Reduce the risk of reoffending by offenders in the community.

RCW 9.94A.010 (emphasis added). In order to achieve that purpose, the SRA gives sentencing courts the discretion to impose sentences outside of the standard range: "The court may impose a sentence outside the standard range for an offense if it finds, considering the purpose of this chapter, that there are substantial and compelling reasons justifying an exceptional sentence." RCW 9.94A.535.

2

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 92605-1
Madsen, J., concurring in result only

Although the SRA explicitly gives sentencing courts the discretion to impose exceptional sentences, it also sets forth certain crimes with mandatory minimum sentences from which sentencing courts have no discretion to depart. RCW 9.94A.540. The legislature explicitly stated that such mandatory minimums "shall not be varied or modified under RCW 9.94A.535," the exceptional sentence provision. RCW 9.94A.540(1). The enumerated crimes for which courts do not have the power to impose exceptional sentences do not include any of the crimes or enhancements at issue in this case. *See* RCW 9.94A.540. And where a statute specifies the things on which it operates, we infer the legislature intended all omissions. *Queets Band of Indians v. State*, 102 Wn.2d 1, 5, 682 P.2d 909 (1984). Therefore, RCW 9.94A.540 did not apply in this case to deprive the sentencing court of its ability to consider an exceptional sentence.

The mandatory firearm sentencing enhancements found in RCW 9.94A.533 were originally part of the "Hard Time for Armed Crime" initiative that the legislature passed in 1995. *State v. Broadaway*, 133 Wn.2d 118, 122-23, 942 P.2d 363 (1997). The legislative title was "'An Act Relating to increasing penalties for armed crimes.'" *Id.* at 123 (quoting LAWS OF 1995, ch. 129). When the legislature originally passed the initiative, it specifically amended RCW 9.94A.310 (now RCW 9.94A.533). LAWS OF 1995, ch. 129, § 2. But it did not amend the provisions relating to exceptional sentences or mandatory minimums. Even when the legislature has amended this enhancement statute subsequently, it still has not amended the exceptional sentence or mandatory minimum provisions. *See, e.g.*, LAWS OF 1998, ch. 235. RCW 9.94A.533 simply does

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 92605-1
Madsen, J., concurring in result only

not purport to amend either the exceptional sentence or mandatory minimum provisions of the SRA.

Further, unlike the mandatory minimum provision, RCW 9.94A.533 does not exclude the enhanced sentences from modification under the exceptional sentence provision. RCW 9.94A.533 also does not add to the list of enumerated crimes for which there are mandatory minimum sentences. This court erred when it found that those provisions do not apply. Consistent with the purposes of the SRA, sentencing courts maintain the discretion to impose exceptional sentences, even when the sentence has enhancements.

The circumstances of this case highlight the purpose of that discretion and the need to preserve it. Houston-Sconiers was 17 years old when he committed this crime, and Roberts was only 16 years old. Under their current sentences, both will be in their forties when released. We have held that a defendant's youthfulness can support an exceptional sentence below the standard range applicable to an adult felony defendant. *State v. O'Dell*, 183 Wn.2d 680, 698-99, 358 P.3d 359 (2015). And a sentencing court must exercise its discretion to decide when that is. *Id.* Without the discretion to depart from otherwise mandatory sentence enhancements, sentencing courts are bound in a way that is inconsistent with the SRA's goal of promoting sentences that are proportional, commensurate, and just.

This reading is also consistent with the fundamental nature of sentencing enhancements. An enhancement increases the presumptive or standard sentence; it is not

4

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

a separate sentence. *State v. Silva-Baltazar*, 125 Wn.2d 472, 475, 886 P.2d 138 (1994);

*see also* RCW 9.94A.533(3) (enhancement time "shall be added to the standard sentence

range for felony crimes"). There is no reason why a sentencing court, which has the

discretion to depart from a standard range sentence, loses that discretion when imposing

an exceptional sentence that increases the standard range. Even with the enhancement,

the sentence is still simply a standard range sentence. The enhancement does not

transform that sentence into a mandatory minimum.

Recognizing that sentencing courts have the discretion to modify firearm

enhancements when imposing an exceptional sentence would align these cases with the

rest of our sentencing jurisprudence. In *In re Personal Restraint of Mulholland*, 161

Wn.2d 322, 331, 166 P.3d 677 (2007), we found that sentencing courts have the

discretion to impose an exceptional sentence—by running the sentences concurrently—

for multiple serious violent offenses. *See* RCW 9.94A.589(1)(b). This is true even

though the legislature provided that sentences for multiple serious violent offenses "shall

be served consecutively to each other." *Id.* And it is true despite the fact that we had

said, in dicta, two years prior that such sentences must be applied consecutively. *See*

*State v. Jacobs*, 154 Wn.2d 596, 603, 115 P.3d 281 (2005). In the 18 years since *Brown*,

we have continued to develop our sentencing jurisprudence by allowing courts to exercise

the discretion given to them by the legislature when they are imposing exceptional

sentences. Continuing to deny sentencing courts such discretion in cases involving

firearm enhancements is untenable.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Under RCW 9.94A.535, a sentencing court has discretion to depart below or above a standard range sentence by imposing an exceptional sentence. This standard range sentence includes any applicable enhancement. The failure to exercise discretion— for example, by failing to consider an exceptional sentence authorized by statute—is an abuse of that discretion. *O'Dell*, 183 Wn.2d at 697 (citing *State v. Grayson*, 154 Wn.2d 333, 342, 111 P.3d 1183 (2005)).

In this case, the sentencing court erroneously believed that the firearm enhancements robbed it of the ability to impose an exceptional sentence. The sentencing court told Houston-Sconiers:

> [Judges] don't have the discretion we had 30 years ago in terms of sentencing.
> And it frustrates me because as I'm sitting here, I wouldn't tell you I wouldn't exercise more discretion in your favor if I had that opportunity to do so. But the law is an oath that I took to enforce. And in this particular case, I don't have any option because if I did do something different than what the law requires me to do, it would simply be overturned by another court, and we'd be back here for resentencing.

25 Verbatim Report of Proceedings (Sept. 13, 2013) at 2401-02. Similarly, the sentencing court told Roberts:

> The only mercy I have has already been executed by the prosecutor in recommending a zero sentence on the underlying crimes. . . .
> Three-hundred and twelve months [on the firearm enhancements] is what I'm compelled to sentence you to.

*Id.* at 2418. The sentencing court's failure to recognize its discretion was an abuse of that discretion.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 92605-1
Madsen, J., concurring in result only

As we have said before, "[w]hile no defendant is entitled to an exceptional sentence . . . every defendant *is* entitled to ask the trial court to consider such a sentence and to have the alternative actually considered." *Grayson*, 154 Wn.2d at 342 (citing *State v. Garcia-Martinez*, 88 Wn. App. 322, 330, 944 P.2d 1104 (1997)). And where an appellate court "'cannot say that the sentencing court would have imposed the same sentence had it known an exceptional sentence was an option,'" remand is proper. *Mulholland*, 161 Wn.2d at 334 (quoting *State v. McGill*, 112 Wn. App. 95, 100-01, 47 P.3d 173 (2002)). Based on the sentencing court's statements, we cannot say that it would have imposed the same lengthy sentence had it known that it could impose an exceptional sentence. Therefore, the proper remedy is to remand.

As I said in *Brown*, the court's decision to transform a sentence enhancement into a mandatory minimum has robbed judges of the discretion that the legislature, through the SRA, expressly gives them in order to fulfill the purposes of the act. And denying judges the discretion in this context is inconsistent with our recognition of discretion for similar sentences. Proportionality, equality, and justice demand that we preserve judicial discretion to impose exceptional sentences. Because these consolidated cases highlight the travesty of this court's decision in *Brown*, I would resolve this case by holding that sentencing courts have the discretion to depart from the mandatory firearm enhancements when imposing exceptional sentences. Because the sentencing judge in these cases failed to recognize that discretion, we should remand the cases for resentencing.

For those reasons, I respectfully concur in result only.

7

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 92605-1
Madsen, J., concurring in result only

_Madsen, J._