Siddoway, J.
¶1 Shalin Alltus appeals her convictions and sentence for the 2014 premeditated murder of her uncle and related crimes, committed when she was 16 years old. We affirm the convictions but in the published portion of the opinion hold that the trial court abused its discretion when it denied Ms. Alltus's request to bifurcate her sentencing, order a presentence report, and afford her lawyers sufficient time to present evidence of mitigating circumstances related to her youth. We remand with directions to order a presentence report and conduct a new sentencing hearing.
*573 BACKGROUND FACTS
¶2 On October 5, 2014, Patrick Alltus was found dead in his Riverside, Washington, home. He was found wrapped in blankets with a plastic bag over his head. He had gunshot wounds and a blunt force injury to his forehead. A bullet had passed through his right wrist and re-entered his right bicep. From the angle of the wounds, his arm had to be bent at the elbow at the time he was shot. He had been shot in the face with a shotgun, with the pellets and wadding entering his jaw, breaking teeth, lacerating the left internal carotid artery and jugular vein, and striking his vertebrae.
¶3 The cause of death was determined to be bleeding out, probably within 30 minutes of the shotgun blast. The bullet that struck him in the wrist and bicep was consistent with a .22 caliber rifle and the pellets and wadding in his face were consistent with a .410 shotgun.
¶4 The last time anyone had heard from Mr. Alltus was late on September 30, 2014, when his girlfriend had received a text message. Although Mr. Alltus's 16-year-old niece Shalin Alltus and another teen, Parker Bachtold, had been living with Mr. Alltus, no one else was on the property when his body was found. One of Patrick Alltus's pickup trucks was missing. Law enforcement issued a statewide alert for the missing truck and listed Ms. Alltus and Mr. Bachtold as potential suspects.
¶5 On October 6, 2014, Ms. Alltus and Mr. Bachtold were arrested at a motel in Oregon, where Mr. Bachtold's father and stepmother had been staying. Mr. Alltus's missing truck was located at the motel and his .22 rifle and .410 shotgun were found in Mr. Bachtold's parents' motel room.
¶6 Mr. Bachtold and Ms. Alltus were both questioned by police. Although both originally denied any knowledge of Patrick Alltus's death, Mr. Bachtold eventually admitted to his role in the shooting.
¶7 According to Mr. Bachtold, he was sleeping in a bedroom on the night Mr. Alltus was shot. Around midnight, he was awakened by a gunshot. He picked up the .410 shotgun that was in the room, loaded it, and stepped into the hallway. Looking down the hallway, Mr. Bachtold saw Ms. Alltus in the living room, behind a couch. Patrick Alltus's .22 rifle was on the ground. Mr. Alltus was coming around the side of the couch, angrily saying something to the effect, "Fuck," "God damn it," "you shot me." 2 Report of Proceedings (2 RP) at 345.[1] There was blood on his head and blood running down his hand. As Mr. Alltus approached Ms. Alltus, Mr. Bachtold shot him in the head with the .410 shotgun.
¶8 After shooting Mr. Alltus, Mr. Bachtold claims he covered his body with a blanket and Ms. Alltus placed a plastic bag over his head. Ms. Alltus and Mr. Bachtold then grabbed a few items from the home, including the shotgun and rifle, and fled in Mr. Alltus's truck. They drove to Curtin, Oregon, where Mr. Bachtold knew his father and stepmother were staying at the time. He was aware that they had purchased a store there, and would be remodeling it.
¶9 Mr. Bachtold and Ms. Alltus had arrived in the Curtin area when the truck ran out of gas near the store being purchased by the Bachtold parents. Mr. Bachtold was trying to push the car when an Oregon state trooper stopped and questioned him and Ms. Alltus. The trooper asked for their names, and both Ms. Alltus and Mr. Bachtold provided false identities. When asked by the trooper for identification, Ms. Alltus told him she did not have identification with her, which was false. The trooper was called away to another incident and after he left, Mr. Bachtold put the .410 shotgun and .22 rifle in the store building.
¶10 The next morning, Mr. Bachtold and Ms. Alltus met up with Mr. Bachtold's father and stepmother at the motel where the parents *574 were staying. Mr. Bachtold's stepmother asked him whose truck he was driving and where all the items in his possession came from. Mr. Bachtold answered that he had been working for Ms. Alltus's uncle and had earned them, which Ms. Alltus affirmed.
¶11 Mr. Bachtold's parents rented a second motel room for Mr. Bachtold and Ms. Alltus, where they stayed until the teens were located by police and taken into custody shortly thereafter, on October 6. During their stay, Mr. Bachtold spent a substantial amount of time working with his father at the store, leaving Ms. Alltus behind at the motel.
¶12 A few days into their stay, Mr. Bachtold showed his father the two guns taken from Mr. Alltus's home. The senior Mr. Bachtold took them and stored them in his motel room, where they were later recovered by police. The senior Mr. Bachtold explained that he took the guns because he disapproved of his son having them in his possession.
¶13 Ms. Alltus was eventually charged, as a principal or an accomplice, with first degree aggravated murder, first degree robbery, theft of a motor vehicle, and two counts of theft of a firearm. Being a juvenile, she was also charged with two counts of second degree unlawful possession of a firearm by a juvenile.
¶14 During the five-day jury trial, witnesses testified to the discovery of Mr. Alltus's death, the police and forensic work that followed, and Mr. Bachtold's and Ms. Alltus's actions following Mr. Alltus's death.
¶15 There was also testimony that within the week before Mr. Alltus was shot, he, Ms. Alltus, and Mr. Bachtold visited a neighboring 17-year-old who had previously worked on Patrick Alltus's ranch. During the visit, Ms. Alltus and Mr. Bachtold shot the .410 shotgun Patrick Alltus had brought, as well as the young ranch hand's .22 rifle. The ranch hand testified that Ms. Alltus shot the .410 shotgun once or twice and seemed nervous about shooting it, while Mr. Bachtold shot almost an entire box of ammunition.
¶16 The State also offered the testimony of Ms. Alltus's father's former girlfriend, who had visited Ms. Alltus in jail following her arrest. She testified that Ms. Alltus told her "that Patrick [Alltus] had been teaching her how to shoot and that she had liked it." 1 RP at 323. She testified that Ms. Alltus also stated that Mr. Alltus had been shot in his hand and the bullet had exited his elbow-facts consistent with the wounds caused by the rifle, but that had not been disclosed to Ms. Alltus by law enforcement.
¶17 The State called Mr. Bachtold as one of its last witnesses, on the fourth day of trial, and he testified to his version of his and Ms. Alltus's involvement in the murder.
¶18 In the defense case, Ms. Alltus recalled Mr. Bachtold for additional questioning and testified in her own defense. She denied any involvement in her uncle's murder, claiming she was sleeping when awakened by the sound of Mr. Bachtold's shots. She told jurors that she joined Mr. Bachtold in his flight and failed to report to anyone what had happened because she was afraid of Mr. Bachtold.
¶19 The jury found Ms. Alltus guilty of all of the charges, but did not find any aggravators the State had alleged for its premeditated murder charge. Although the jury returned its verdict at 9:23 p.m. on the fifth trial day, the State asked for sentencing to be scheduled "as early as tomorrow" because it had "several family members of the victim present." 3 RP at 211. The trial court agreed, indicating it would sentence Ms. Alltus at 10:00 a.m. the next morning. Id . After defense counsel told the trial court, "[W]e cannot possibly prepare the mitigation necessary by ten o'clock tomorrow morning" and asked that it be scheduled on Wednesday, which would have been two days later, the trial court stated it would sentence Ms. Alltus at 3:30 p.m. the following day. 3 RP at 211-12.
¶20 The following day, before the sentencing hearing, Ms. Alltus filed a motion asking the court to continue the sentencing hearing and order a presentence report. She argued that the court could not make an informed decision without knowing more about her difficult family background, certain traumas, and her mental health history. At the hearing, defense counsel said she had no objection *575 to bifurcating the process so that family members could make statements at that time, with the remainder of the sentencing to be completed later. The trial court observed that the defense attorney's contract services were ending the following day, to which she responded she would nonetheless make herself available for a continued hearing. The trial court went forward anyway, observing that the presentence report would add nothing significant from its perspective.
¶21 After hearing from the parties and the witnesses, the court sentenced Ms. Alltus to 460 months of total confinement. Ms. Alltus appeals.
ANALYSIS
¶22 Ms. Alltus makes eight assignments of error that require review.[2] We first address her challenges to the court's refusal to continue her sentencing hearing and to its conduct of that hearing. In the unpublished portion of the opinion we provide additional procedural background and address the remaining assignments of error.
I. THE TRIAL COURT ABUSED ITS DISCRETION IN FAILING TO BIFURCATE THE SENTENCING HEARING AND ORDER A PRESENTENCING REPORT
¶23 Ms. Alltus challenges the trial court's conduct of the sentencing hearing on three grounds. Because we conclude that the trial court abused its discretion by denying Ms. Alltus's request for a continuance and preparation of a presentence report, we need not address her two related arguments that her sentence was a de facto life sentence that required a Miller[3] hearing.
¶24 A sentencing hearing shall be held within 40 court days following conviction, and the time for conducting the hearing can be continued for good cause. RCW 9.94A.500(1). The trial court has broad discretion to determine whether there is good cause to postpone sentencing. State v. Roberts , 77 Wash. App. 678, 685, 894 P.2d 1340 (1995). We review a court's timing decision for abuse of discretion.
¶25 CrR 7.1(a) provides that after a defendant pleads or is found guilty, "the court may order that a risk assessment or presentence investigation and report be prepared by the Department of Corrections, when authorized by law." CrR 7.1(b) identifies what the report is to contain:
The report of the presentence investigation shall contain the defendant's criminal history, as defined by RCW 9.94A.030, such information about the defendant's characteristics, financial condition, and the circumstances affecting the defendant's behavior as may be relevant in imposing sentence or in the correctional treatment of the defendant, information about the victim, and such other information as may be required by the court.
A comment to the rule states that it "giv[es] the court a measure of discretion to dispense with a report when the appropriate sentence can readily be determined on the basis of the sentencing guidelines score sheet." CrR 7.1, cmt.
¶26 "Where the decision of the trial court is a matter of discretion, it will not be disturbed on review except on a clear showing of abuse of discretion." Farmer v. Davis , 161 Wash. App. 420, 430, 250 P.3d 138 (2011). Here, the trial court explained that Ms. Alltus did not have any criminal history or finances that would be identified by the report, and it did not believe the report would *576 be helpful to the court in sentencing. 3 RP at 224-26.
¶27 The responsibilities of a court in sentencing a juvenile must be taken into consideration by the court in exercising its discretion on the timing of the sentencing hearing and whether to order a presentence report. In State v. Scott , 190 Wash.2d 586, 416 P.3d 1182 (2018), our Supreme Court reiterated its earlier holding in State v. Houston-Sconiers , 188 Wash.2d 1, 20, 391 P.3d 409 (2017) that the Eighth Amendment requires sentencing courts to treat children differently, with discretion, and with consideration of mitigating factors. As the court explained in Scott :
Applying Miller , this court held that "[t]rial courts must consider mitigating qualities of youth at sentencing and must have discretion to impose any sentence below the otherwise applicable SRA [ (Sentencing Reform Act of 1981, ch. 9.94A RCW) ] range and/or sentence enhancements." [ Houston-Sconiers , 188 Wn.2d] at 21 [391 P.3d 409] (emphasis added). This court explained in Houston-Sconiers , "Critically, the Eighth Amendment requires trial courts to exercise this discretion at the time of sentencing itself , regardless of what opportunities for discretionary release may occur down the line." Id. at 20, 391 P.3d 409 (emphasis added).
190 Wash.2d at 594-95, 416 P.3d 1182 (some alterations in original). The requirements announced in Houston-Sconiers are not limited to juveniles who receive de facto life sentences; in Houston-Sconiers the teenaged defendants faced sentences of only 26 and 31 years.
¶28 The Supreme Court recently reiterated the extent of consideration required:
[T]he court must consider the mitigating circumstances related to the defendant's youth, including, but not limited to, the juvenile's immaturity, impetuosity, and failure to appreciate risks and consequences-the nature of the juvenile's surrounding environment and family circumstances, the extent of the juvenile's participation in the crime, the way familial and peer pressures may have affected him or her, how youth impacted any legal defense, and any factors suggesting that the juvenile might be successfully rehabilitated.
State v. Gilbert , 193 Wash.2d 169, 176, 438 P.3d 133 (2019) (citing Houston-Sconiers , 188 Wash.2d at 23, 391 P.3d 409 (quoting and citing Miller , 567 U.S. at 477, 132 S.Ct. 2455 )).
¶29 In requesting that the court bifurcate the sentencing, hear from the victim family members first, and then continue the balance of the sentencing hearing in order to obtain a presentence investigation, Ms. Alltus identified the following matters on which the court should be fully informed:
Defendant has mental health records from Okanogan Behavioral Health from April 28, 2015 to August 17, 2016 reflecting her ongoing therapy with Lisa Orr, which include:
Behavioral Health AssessmentDiagnostic SummaryInitial Treatment PlanSuicide Risk Assessment34 Separate Mental Health Progress Notes
Defendant is currently prescribed and taking psychotropic medication.
Defendant was the victim of a Rape/Kidnapping at the age of 13 where the perpetrator was convicted and sentenced to prison.
Defendant[,] who was less than two months past her 16th birthday at the time of the crimes she has been convicted for[,] has significant family issues including extensive CPS interaction, records for which the defense does not possess.
Defendant's biological mother gave up parental rights to her.
Defendant had at least one order of protection with her biological father.
CP at 65 (original numbering omitted).
¶30 While the trial court did not need criminal history or financial information, the matters identified by Ms. Alltus were "defendant's characteristics" and "circumstances affecting the defendant's behavior as may be relevant in imposing sentence"-matters that would be covered by a presentence report.
*577 CrR 7.1(b). The matters identified were the type of matters our Supreme Court requires sentencing courts to consider when a juvenile is involved, and matters the defense could not reasonably be expected to compile itself in less than a day.
¶31 Under these circumstances, we hold that it was an abuse of discretion for the trial court to deny Ms. Alltus's request that the court bifurcate her sentencing hearing and order a presentence report.
¶32 The convictions are affirmed. The sentence is reversed and the case is remanded with directions to order a presentence report and, when it has been provided, conduct a new sentencing hearing.
¶33 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder having no precedential value shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.
WE CONCUR:
Lawrence-Berrey, C.J.
Fearing, J.

We cite in this opinion to three of seven volumes of reported proceedings. The three volumes cited are not consecutively paginated. We cite the volume that contains voir dire and other proceedings taking place on August 23 and 24, 2016, as "1 RP." We cite the volume that contains trial proceedings taking place beginning on August 25, 2016, and continuing through closing argument as "2 RP." We cite the volume that contains some pretrial proceedings, the jury's verdict, and the sentencing hearing as "3 RP."

A due process challenge to the automatic decline procedure raised by Ms. Alltus has since been rejected by the Supreme Court in State v. Watkins , 191 Wash.2d 530, 423 P.3d 830 (2018) (reaffirming In re Boot , 130 Wash.2d 553, 925 P.2d 964 (1996) ).
Ms. Alltus pre-emptively asks us not to impose costs if the State is the substantially prevailing party on appeal, but panels of the court no longer entertain such argument. A recent general order of this court announced that our clerk or commissioner will henceforth decide these cost issues. See Gen. Order to Rescind (Wash. Ct. App. Feb. 19, 2019), http://www.courts.wa.gov/appellate_trial_courts/div3/Order-Rescind%20Deny%20Request%20to%20Award%20Costs%20General%20Order%202-19-19.pdf.
Ms. Alltus's identification of an alleged scrivener's error in the judgment and sentence is rendered moot by our reversal of her sentence and remand for resentencing.

Miller v. Alabama , 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012).