# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  54660-4-II |
| Respondent, | |
| v. | |
| KADRIAN MARQUEE DAVIS, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, C.J. — Kadrian M. Davis appeals his convictions and sentence for six counts of first degree assault with firearm enhancements, first degree kidnapping with a firearm enhancement, and first degree burglary.  Davis argues that (1) there was insufficient evidence to support the jury's verdicts on first degree assault and first degree kidnapping, (2) the trial court erred by denying his request to run the firearm enhancements concurrently, (3) he was deprived of his due process right to a fair trial, (4) he received ineffective assistance of counsel, and (5) the trial court violated the appearance of fairness doctrine.  In a statement of additional grounds (SAG),[1] Davis claims that prosecutorial misconduct occurred when the prosecutor repeatedly asked leading questions during testimony and made false representations during closing arguments and the cumulative effect of the errors deprived him of a fair trial. [2]

---

[1]  RAP 10.10.

[2]  Davis also claims in his SAG that there was insufficient evidence to support his convictions for first degree assault and that the trial court erred by running the firearm sentencing enhancements concurrently.  These claims are addressed in Davis' direct appeal, and, therefore, we do not address them separately in his SAG.

We hold that (1) sufficient evidence supports the jury's verdicts; (2) the trial court did not err in imposing consecutive firearm sentencing enhancements; (3) Davis' due process challenge is not properly before us on appeal and, therefore, we do not address it; (4) Davis did not receive ineffective assistance of counsel; and (5) Davis has waived his challenge to the appearance of fairness. As to Davis' SAG claims, we hold that there was no prosecutorial misconduct and the cumulative error doctrine does not apply. Accordingly, we affirm.

FACTS

A.    BACKGROUND

On July 4, 2018, Reid Pedder, Taylor Cavazos, Justin Tomlinson, and Dalton Rogers were hanging out at Robert Frank's apartment in Tillicum.[3] Frank lived at the Tillicum apartment with his girlfriend, Samantha Brown; Cristine Haugan, Brown's mother; and Kris Cook, Brown's step-father. Frank's friends, Zachary McBride and Tristen Norton, were also staying at the Tillicum apartment. Several other people were at the Tillicum apartment, including Derrick White, Jake Johnson, Dominick Yerly, Trevor Tague, and Justice Waite-Uren.

White, Waite-Uren, and Johnson left the Tillicum apartment and went to Davis' house. Meanwhile, Pedder, Cavazos, and Yerly left the Tillicum apartment and went to Pedder's house.

While at Pedder's house, Yerly began skateboarding in Pedder's kitchen, and Pedder told him to stop. Yerly began pushing Pedder around, and Cavazos tried getting them to stop. During the altercation, Yerly hit Cavazos. The altercation broke up, and Yerly left.

---

[3] Throughout trial there are many different references to this apartment. For consistency, we will refer to this place as the Tillicum apartment.

When Pedder learned that Yerly had hit Cavazos, he was angry and called Yerly. Yerly said he would return to Pedder's house. Meanwhile, Cavazos called Rogers, who was with Tomlinson, and asked them to come to the house because she did not want Pedder to be alone when Yerly got back to the house. Several people arrived at Pedder's house with Yerly, including Tague. When Yerly arrived, Yerly knocked Pedder out and continued hitting him. Rogers tried to prevent Yerly from continuing to hit Pedder while Pedder was unconscious. Cavazos then called Johnson to come over with Waite-Uren and White because Yerly was refusing to leave the house.

Johnson got the call from Cavazos while he was at Davis' house with Waite-Uren and White. White, Waite-Uren, and Johnson left Davis' house to go to Pedder's house. When they arrived, a commotion was occurring in the front yard of Pedder's house.

White and Waite-Uren had guns when they arrived at Pedder's house, but they gave their guns to Johnson before confronting Yerly. While White and Waite-Uren were confronting Yerly, Tague tried to grab the guns away from Johnson. Tague got a gun away from Johnson and fired a shot towards Johnson's head. Tague fired more shots. At some point, Tague shot White in the shoulder. Waite-Uren got the guns back from Tague and forced Yerly, Tague, and their group to leave. After the group left, White made a phone call.

A short time later, Davis pulled up outside Pedder's house in his truck with his friend, Trey.[4] Pedder and Rogers went to talk to them. Davis and Trey asked where they could find Yerly and Tague. Pedder told them he did not know where Tague was. Cavazos told them that Yerly

---

[4] The majority of witnesses identified two people in the truck as Davis and a man they did not know with dreadlocks. Davis' ex-girlfriend identified this man as Trey.

and Tague were not at the Tillicum apartment. Rogers also tried telling them that Yerly and Tague were not at the Tillicum apartment. Davis then pulled out a gun and demanded that Rogers get in the truck. Davis, Trey, White, and Rogers left in the truck. Cavazos called Brown and told her that a fight had broken out at her house and that White had been shot. She also told Brown that some people were going to Brown's Tillicum apartment looking for Yerly and Tague.

Brown was at a store with Haugen when she received Cavazos' phone call. When Brown and Haugen returned to the Tillicum apartment, Cook was there with his friend D'Shawn Ruch. McBride and Norton also returned to the Tillicum apartment. Brown, Haugen, Ruch, and Cook were in Haugen's room, but Cook repeatedly went outside to see if anyone came.

Meanwhile, Rogers provided Davis directions to the Tillicum apartment. When they arrived, Rogers pointed out the Tillicum apartment and the other men demanded that Rogers get out of the car with them. Davis threatened to shoot Rogers if he ran.

Davis and Trey loaded their guns. The group walked towards the Tillicum apartment with Rogers in the front. As they were approaching the building, Cook was outside of the Tillicum apartment by his car. Cook told them Yerly and Tague were not there, then backed away. Davis responded by punching Cook several times. Cook ran back into the apartment. Davis and Trey followed Cook and began kicking the door. When Davis and Trey could not get into the apartment, they walked back down the driveway to White and Rogers. Davis and Trey fired numerous shots towards the apartment. When they stopped shooting, Davis told Rogers to get back into the truck.

Davis, White, Rogers, and Trey returned to Pedder's house. Davis, White, and Trey began arguing with Johnson and Waite-Uren about the earlier fight at Pedder's house when White was shot. Davis and Trey then punched Rogers, Johnson, Tomlinson, and Pedder.

The State charged Davis with six counts of first degree assault for the shooting at the Tillicum apartment—one count for each person present at the apartment at the time of the shooting. The State also charged Davis with one count of first degree kidnapping involving Rogers, and one count of first degree burglary—based on entering Pedder's house after the shooting where White was shot.[5] All of the charges, except the first degree burglary charge, charged Davis as a principle or accomplice and alleged Davis was armed with a firearm.

B.    JURY TRIAL

1.    Testimony

Pedder, Cavazos, Rogers, Waite-Uren, Johnson, Tomlinson, and Brown testified to the facts above. Several other witnesses including Frank, Norton, McBride, Cook, Haugan, and Ruch also testified at trial.

During his testimony, Pedder specifically identified Davis as one of the people who showed up in the truck after White was shot. Rogers testified that there were two people in the truck that arrived after White was shot. Rogers also testified that the person in the passenger seat of truck had long dreadlocks. Rogers was not able to describe or identify the driver of the truck. Cavazos testified that two people arrived in the truck, one of whom had dreadlocks. Cavazos also identified

---

[5] The State also charged Davis with one count of drive-by shooting and one count of attempted first degree burglary—based on attempting to enter the Tillicum apartment. However, neither of these charges were submitted to the jury. The trial court later dismissed those charges.

Davis as the other person who was in the truck. Davis' ex-girlfriend, Alejandra Moran, testified that Davis has a friend with dreadlocks named Trey.

After Pedder finished testifying, while the jury was out of the courtroom, the trial court told the prosecutor:

> This anticipated testimony with several young witnesses, I think it's probably cultural, and it's youth. But this slouching down and mumbling and interrupting—I don't like to be the one to correct a witness, but I have to protect the record. Will you please speak to these young witnesses before they come in?

8 Verbatim Report of Proceeding (VRP) at 410.

Detective Jeff Martin of the Lakewood Police Department was assigned to investigate the shooting at the Tillicum apartment. During Detective Martin's investigation, Pedder identified Davis as the person who showed up at his house in the truck. Martin also analyzed data from Davis' cell phone records. The cell phone data showed that Davis' phone moved towards Pedder's house, then towards the Tillicum apartment, then back towards Pedder's house.

2.    Dismissal Of Juror 7

On the morning of closing arguments, the trial court alerted the parties that they had "lost Juror No. 7." 15 VRP at 1512. Juror 7 had contacted the judicial assistant and said that she could not be at court. Defense counsel spoke with Davis and informed the trial court that Davis had no issue with releasing Juror 7.

In dismissing Juror 7, the trial court stated:

> I certainly noticed that Juror 7 was nodding off. I noticed it at least three times. She nodded off to the point, I believe, on Tuesday that she dropped her pad and her pen from her lap and it fell to the floor, and then she was startled awake.

15 VRP at 1524. The trial court then stated:

6

She is the only African American juror that was on this panel, and I'm disappointed to lose her, but there's nothing I can do when I've got a juror that will not cooperate or participate.

15 VRP at 1524.

3. Closing Arguments

In its closing argument, the State discussed the events surrounding the shooting that occurred at the Tillicum apartment. The prosecutor argued that before going to back to the Tillicum apartment, Davis first went to Pedder's house to find Yerly and Tague, stating, "Trey came with Kadrian Davis over to the house in the blue pickup truck." 15 VRP at 1570. The prosecutor then argued, "[T]he defendant and—we'll call him 'Trey' for lack of anything else were demanding to know where Dominik Yerly and Trevor Tague were." 15 VRP at 1570. The prosecutor further argued, "[T]he defendant and this—and Trey apparently believed that they were at [the Tillicum apartment]." 15 VRP at 1570.

The prosecutor then discussed what happened when Davis arrived at the Tillicum apartment. The prosecutor stated that Davis got out of the truck and walked towards the Tillicum apartment. 15 VRP 1572. The prosecutor then stated, "And at that point the defendant struck Kris Cook in the face, punched him." 15 VRP at 1572. The prosecutor argued that when Cook went back into the apartment, the shooting began. 15 VRP 1572-73. After the shooting, the prosecutor argued, "The defendant and the others then went back to the truck." 15 VRP at 1573.

During the rebuttal closing argument, the prosecutor admitted "that no one was able to say 'That guy that fired the gun was the defendant.'" 15 VRP at 1624. However, the prosecutor later argued that "[w]e may not have direct evidence that it was . . . Davis that fired these shots. We

7

have ample circumstantial evidence." 15 VRP at 1624. The prosecutor then provided the circumstantial evidence they believed pointed to Davis. For example, the State pointed out that Rogers identified the driver of the truck as the person who threatened him and fired shots at the Tillicum apartment. And the State argued that because Pedder and Cavazos identified Davis as arriving in the truck and there was evidence that Davis owned the truck, there was circumstantial evidence allowing the jury to infer Davis was the driver of the truck. Defense counsel did not object to these arguments.

C.      VERDICTS AND SENTENCING

The jury found Davis guilty of all six counts of first degree assault. The jury also found Davis guilty of first degree kidnapping and first degree burglary. The jury further found that Davis was armed with a firearm at the time of the commission of the assaults and kidnapping.

At sentencing, the trial court found the presumptive standard sentencing range, 627-830 months, plus 420 months of sentencing enhancements was clearly excessive. Therefore, the trial court imposed an exceptional sentence below the standard range by ordering the sentences for five of the six assault charges and the sentence for the first degree burglary to run concurrently with the sentences for one count of first degree assault and the sentence for kidnapping. The trial court also ordered that the seven firearm sentencing enhancements run consecutively because it did "not believe it [had] any discretion to deviate from the mandatory firearm enhancement." Clerk's Papers (CP) at 511. The trial court imposed a total of 582 months confinement.

Davis appeals his convictions and sentence.

8

ANALYSIS

A.     SUFFICIENCY OF THE EVIDENCE

Davis argues that there was insufficient evidence to support the jury's verdicts finding him guilty of six counts of first degree assault and first degree kidnapping. We disagree.

Evidence is sufficient to support a conviction if any rational trier of fact can find the essential elements of the crime beyond a reasonable doubt. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). The evidence must be viewed in the light most favorable to the State and interpreted most strongly against the defendant. *Id*. Circumstantial and direct evidence are equally reliable. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). A claim of insufficiency of evidence admits the truth of the State's evidence and all inferences that reasonably can be drawn from the evidence. *Salinas*, 119 Wn.2d at 201.

1.     First Degree Assault

Davis argues that there is insufficient evidence to convict him on all counts of first degree assault because Cook and Rogers, the only eyewitnesses to the shooting, did not identify him as a shooter. Davis also argues that the State failed to prove that the shooters intended to inflict harm on the specifically named occupants in the Tillicum apartment.

"A person is guilty of assault in the first degree if he or she, with intent to inflict great bodily harm . . . assaults another with a firearm or any deadly weapon or by any force or means likely to produce great bodily harm or death." RCW 9A.36.011(1)(a). Assault is defined as unlawful touching; an attempt with unlawful force to inflict bodily injury upon another, tending

but failing to accomplish it; and putting another in the apprehension of harm. *State v. Elmi*, 166 Wn.2d 209, 215, 207 P.3d 439 (2009).

"The mens rea for first degree assault is the specific intent to inflict great bodily harm." *Id*. Specific intent is the "intent to produce a specific result." *Id*. "First degree assault does not, under all circumstances, require that the specific intent match a specific victim. *Id*. "[O]nce the specific intent to inflict great bodily harm is established, this intent may transfer to any unintended victim." *Id.* at 217. The unintended victim does not need to physically be harmed. *Id.* at 218. The defendant "bears the risk of multiple convictions when several victims are present, regardless of whether the defendant knows of their presence." *Id*.

First, although neither Cook nor Rogers specifically identified Davis as a shooter, there was sufficient circumstantial evidence to support the jury's verdict. Pedder testified that Davis and a person with dreadlocks pulled up to his house in a truck after White was shot. Pedder testified that, although he did not see Rogers get in the truck, Rogers was gone after the truck left. Moran testified that Davis had a friend with dreadlocks named Trey.

Rogers testified that the driver of the truck participated in the shooting at the Tillicum apartment. The jury could infer that Davis was the driver of the truck that Rogers testified participated in the shooting at the Tillicum apartment because there were only two men who arrived in the truck at Pedder's house and those two men then went from Pedder's house to the Tillicum apartment—one person was identified by others as Davis and the other person had dreadlocks, identified as Trey. Because there was sufficient evidence for the jury to infer that Davis was the man without dreadlocks referred to in Rogers' testimony, there was sufficient

evidence for the jury to infer that Davis drove Rogers, White, and Trey to the Tillicum apartment in his truck, loaded a gun, and participated in firing multiple shot at the Tillicum apartment.

Second, first degree assault does not require specific intent to match a specific victim. *Id.* at 215. Here, the jury could reasonably infer that Davis and Trey intended to cause serious bodily harm to Yerly and Tague because they were angry at them for fighting with Pedder and Cavazos and shooting White. Davis and Trey believed that Yerly and Tague were at the Tillicum apartment because they went there despite multiple people telling them that Yerly and Tague were not at the Tillicum apartment. Furthermore, there was sufficient evidence for the jury to find that Davis and Trey intended to cause serious bodily harm to Cook by shooting at him because Davis punched Cook when he said Yerly and Tague were not there and then chased him to the apartment and tried to kick in the door. Because there was sufficient evidence that Davis and Trey intended to cause serious bodily harm to Yerly, Tague, or Cook by shooting into the Tillicum apartment, that intent transferred to all the people who were in the apartment at the time, whether Davis specifically intended to harm those people or not. *See id.* at 217.

There was sufficient circumstantial evidence for the jury to find that Davis was a participant in the shooting at the Tillicum apartment. There was also sufficient evidence for the jury to find that Davis shot at the Tillicum apartment with the specific intent to cause serious bodily harm. Accordingly, there was sufficient evidence to support the jury's verdicts finding Davis guilty of six counts of first degree assault.

2. First Degree Kidnapping

Davis further argues that there was insufficient evidence to support the jury's verdict finding him guilty of first degree kidnapping because the State failed to prove that he was present during the kidnapping or that the kidnapping even occurred.

A person commits first degree kidnapping when they "intentionally abduct another person with intent . . . [t]o facilitate [the] commission of any felony or flight thereafter." RCW 9A.40.020(1)(b). "'Abduct' means to restrain a person by . . . using or threatening to use deadly force." RCW 9A.40.010(1).

Here, there was sufficient evidence to support the jury's verdict finding Davis guilty of first degree kidnapping because the jury could infer that the person who ordered Rogers into the truck at gunpoint was Davis. As explained above, although Rogers did not identify Davis, other people identified Davis as the person who did not have dreadlocks. Because Davis threatened Rogers with a firearm, he used the threat of deadly force to get Rogers into the truck. And the jury could find that Davis intentionally abducted Rogers with the intent to commit a felony because Davis made Rogers go with them to provide directions to the Tillicum apartment to find Yerly and Tague. There was sufficient evidence for the jury to find that Davis committed first degree kidnapping.

B. CONSECUTIVE FIREARM ENHANCEMENTS

Davis argues that the trial court abused its discretion by ordering that the firearm enhancements run consecutively because it inaccurately believed it did not have the authority to

consider running the firearm enhancements concurrently under *State v. McFarland*, 189 Wn.2d 47, 399 P.3d 1106 (2017). We disagree.

Under RCW 9.94A.533 sentences for firearm enhancements "are mandatory, shall be served in total confinement, and shall run consecutively to all other sentencing provisions." RCW 9.94A.533(3)(e). Based on the plain language of RCW 9.94A.533(3)(e) the trial court does not have discretion to run firearm sentencing enhancements concurrently. *See State v. Brown*, 139 Wn.2d 20, 29, 983 P.2d 608 (1999), *overruled in part on other grounds by State v. Houston-Sconiers*, 188 Wn.2d 1, 391 P.3d 409 (2017).

Despite the plain language of RCW 9.94A.533, Davis argues *State v. McFarland* held that trial courts have the discretion to order firearm enhancements to run concurrently. However, *McFarland* addressed convictions for firearm related offenses not firearm sentencing enhancements. *McFarland*, 189 Wn.2d at 51. *McFarland* is distinguishable because it does not address firearm sentencing enhancements under RCW 9.94A.533, but rather addresses imposition of consecutive sentence for firearm related convictions under RCW 9.94A.589(1)(c). *Id.* at 55.

The trial court correctly determined that it did not have the authority to order the firearm sentencing enhancements to run concurrently. Therefore, the trial court did not abuse its discretion by imposing consecutive firearm sentencing enhancements.

C.      DUE PROCESS RIGHT TO A FAIR TRIAL FREE FROM RACIAL BIAS

Davis argues that his due process right to a fair trial was violated when the trial court removed the only black juror from the jury. Because Davis affirmatively agreed to dismissal of Juror 7, we decline to address his due process argument.

13

"The doctrine of invited error prohibits a party from setting up an error at trial and then complaining of it on appeal." *State v. Mercado*, 181 Wn. App. 624, 630, 326 P.3d 154 (2014). "To be invited, the error must be the result of an affirmative, knowing, and voluntary act." *Id*. An appellant "must materially contribute to the error challenged on appeal by engaging in some type of affirmative action through which he knowingly and voluntarily sets up the error." *Id*. The invited error doctrine applies even to criminal defendants raising constitutional issues. *Id*. at 629-30.

Here, Davis, through his counsel, affirmatively told the trial court that he had no issues with releasing Juror 7. At the time, Davis was aware that the only black juror was being released from the jury and did not only fail to object, but actively informed the trial court that there was no issue with releasing Juror 7. By affirmatively stating that there were no issues with Juror 7 being released, Davis set up the error he now complains of on appeal, dismissal of the only black juror. Therefore, we decline to address Davis' due process argument.

D.      INEFFECTIVE ASSISTANCE OF COUNSEL

Davis argues that he received ineffective assistance of counsel because defense counsel acquiesced to the trial court's removal of the only black juror and failed to "research relevant statutes." Br. of Appellant at 36. We disagree.

We review claims of ineffective assistance of counsel de novo. *State v. Vazquez*, 198 Wn.2d 239, 249, 494 P.3d 424 (2021). To establish ineffective assistance of counsel, a defendant must show that their attorney's performance was deficient and, if it was deficient, that it was prejudicial. *State v. Grier*, 171 Wn.2d 17, 32-33, 246 P.3d 1260 (2011), *cert. denied*, 574 U.S.

860 (2014). An ineffective assistance of counsel claim fails if the defendant fails to establish either deficient performance or prejudice. *Id.* at 33.

Performance is deficient if counsel's representation falls below an objective standard of reasonableness based on consideration of all the circumstances. *Id*. There is a strong presumption that counsel's representation was effective. *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). If the defendant bases their ineffective assistance of counsel claim on the defense counsel's failure to object, "the defendant must show that the objection would likely have succeeded." *State v. Crow*, 8 Wn. App 2d 480, 508, 438 P.3d 541, *review denied*, 193 Wn.2d 1038 (2019).

Any objection from defense counsel would not have succeeded because the trial court properly dismissed Juror 7. Discharge and excusal of an impaneled juror is governed by RCW 2.36.110 and CrR 6.5. Under RCW 2.36.110, the trial court has the duty to excuse "any juror, who in the opinion of the judge, has manifested unfitness as a juror by reason of . . . indifference, inattention . . . or by reason of conduct or practices incompatible with proper and efficient jury service." Further, under CrR 6.5, the trial court has a duty to discharge a juror who "is found unable to perform the duties." "RCW 2.36.110 and CrR 6.5 place a continuous obligation on the trial court to excuse any juror who is unfit and unable to perform the duties of a juror." *State v. Jorden*, 103 Wn. App. 221, 227, 11 P.3d 866 (2000), *review denied*, 143 Wn.2d 1015 (2001).

Although Davis emphasizes the trial court's observation that Juror 7 fell asleep, the trial court did not show any indication that it intended to dismiss Juror 7 until Juror 7 informed the court that she would not be able to attend trial because of childcare issues. If a juror is unwilling or unable to attend the trial, the juror is necessarily unable to perform the duties of a juror. Because

Juror 7 inability to attend trial rendered her unfit for service as a juror, Davis cannot show that an objection to the trial court's decision to dismiss Juror 7 would have been granted, therefore, Davis cannot show that his counsel's performance was deficient.

Davis also argues that defense counsel provided ineffective assistance because counsel "failed to research and recognize the law," specifically GR 37. Br. of Appellant at 37. However, defense counsel did not fail to recognize the law because GR 37 only applies to jury selection and peremptory challenges, not to impaneled jury members. GR 37(a) (the purpose of GR 37 "is to eliminate the unfair exclusion of potential jurors based on race or ethnicity."). Because GR 37 does not apply to dismissal of impaneled jurors, any failure on defense counsel's part to research GR 37 does not fall below an objective standard of reasonableness.

Davis cannot show that defense counsel's performance was deficient, and his ineffective assistance of counsel claim fails.

E.    APPEARANCE OF FAIRNESS DOCTRINE

Davis argues that the trial court violated the appearance of fairness doctrine. Because Davis raises this argument for the first time on appeal, we decline to consider it.

We "may refuse to review any claim of error which was not raised in the trial court." RAP 2.5(a). "'The appellate courts will not sanction a party's failure to point out at trial an error which the trial court, if given the opportunity, might have been able to correct to avoid an appeal and a consequent new trial.'" *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009) (quoting *State v. Scott*, 110 Wn.2d 682, 685, 757 P.2d 492 (1988)). A party may raise a claim for the first time on appeal when it is a manifest error affecting a constitutional right. RAP 2.5(a)(3). However, we

do not address the exceptions to RAP 2.5(a) when a party fails to raise and argue them. *See State v. Cox*, 109 Wn. App. 937, 943, 38 P.3d 371 (2002) (when an appellant fails to provide argument or authority, we are not "required to construct an argument on behalf of appellants").

Davis asserts that the trial court violated the appearance of fairness by dismissing the only black juror, and further demonstrated its bias by commenting on the cultural tendency of black youth to mumble:

> This anticipated testimony with several young witnesses, I think it's probably cultural, and it's youth. But this slouching down and mumbling and interrupting— I don't like to be the one to correct a witness, but I have to protect the record. Will you please speak to these young witnesses before they come in?

8 VRP at 410.

But Davis affirmatively agreed to the dismissal of Juror 7. And Davis did not object to the trial court's comments regarding Pedder's testimony. Therefore, Davis is raising the claim of a violation of the appearance of fairness for the first time on appeal. And Davis has not made any argument asserting that his appearance of fairness challenge meets an exception to RAP 2.5(a). Therefore, we decline to address Davis' argument that the trial court violated the appearance of fairness.

## SAG

### A.    PROSECUTORIAL MISCONDUCT

Davis claims that the prosecutor committed misconduct by asking leading questions and expressing personal beliefs and making arguments unsupported by the evidence in closing arguments. We disagree.

17

To prevail on a claim of prosecutorial misconduct, Davis must show that the prosecutor's conduct was improper and prejudicial. *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). First, we determine whether the prosecutor's conduct is improper. *Id.* at 759. If the prosecutor's conduct was improper, we must then determine whether the conduct was prejudicial. *Id.* at 760.

1.      Leading The Witness

Davis claims that the prosecutor's committed misconduct by "intentionally eliciting inadmissible testimony and intentionally solicited and anticipated that in response to his leading questions [they] would get his specific answers." SAG at 2. A thorough review of the record shows that the prosecutor's questions were not improper.

"Leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony." ER 611(c). "A leading question is one that suggests the desired answer." *Stevens v. Gordon*, 118 Wn. App. 43, 55, 74 P.3d 653 (2003). The trial court has broad discretion to allow leading questions. *Id.* at 55. Further, the asking of leading questions is not usually a reversible error. *Id.* at 56.

Although the prosecutor asked many questions that required yes or no answers, the prosecutor was developing testimony and did not necessarily suggest answers to the question. Even if we considered the prosecutor's questions leading questions, the trial court has broad discretion to allow leading questions. A thorough review of the record shows that the prosecutor did not improperly lead any witnesses. Because the prosecutor's questions were not improper, Davis cannot show that there was any prosecutorial misconduct resulting from improperly leading witnesses.

Davis also claims that the prosecutor objected to Cook's testimony to "attempt[] to make [Cook] now look hostile." SAG at 6. However, the State can object to a nonresponsive answer to its question. *State v. Vassar*, 188 Wn. App. 251, 258, 352 P.3d 856 (2015). Here, the prosecutor asked, "You are telling us what you know happened; correct?" 11 VRP at 1007. While Cook's initial response was responsive, Cook's continued response was nonresponsive, at which point the prosecutor objected on the basis that the response was nonresponsive, which the trial court sustained. The prosecutor's conduct was not improper.

2.      Closing Arguments

Davis also claims that the prosecutor made statements during closing arguments that were not supported by any evidence presented at trial and that the prosecutor made statements that "expressed his personal belief as to the veracity of the witnesses." SAG at 10. Because the prosecutor's arguments were based on reasonable inferences from the evidence, the prosecutor's arguments were not improper.

A prosecutor enjoys wide latitude when making a closing argument. *State v. Fisher*, 165 Wn.2d 727, 747, 202 P.3d 937 (2009). A prosecutor is permitted to draw reasonable inferences from the evidence. *State v. Dhaliwal*, 150 Wn.2d 559, 577, 79 P.3d 432 (2003). However, it is improper for a prosecutor "to express a personal opinion as to the credibility of a witness or the guilt of a defendant." *State v. Lindsay*, 180 Wn.2d 423, 437, 326 P.3d 125 (2014).

Here, Davis claims that the prosecutor committed misconduct by "bringing in [a] statement" that the suspect Trey stated that he was looking for Yerly and Tague. SAG at 10. During closing arguments, the prosecutor argued, "[T]he defendant and—we'll call him 'Trey' for

lack of anything else were demanding to know where Dominik Yerly and Trevor Tague were." 15 VRP at 1570. The prosecutor further argued that, "[T]he defendant and this—and Trey apparently believed that they were at the [Tillicum apartment]." 15 VRP at 1570. Because multiple witnesses testified that Davis and Trey were asking where to find Yerly and Tague and wanted the address to the Tillicum apartment, the prosecutor's arguments were reasonable inferences from the evidence and were not improper.

Davis next claims that the prosecutor made false statements during closing arguments by arguing that Davis and Trey pulled up in a truck to the Tillicum apartment when "Cook 'never' identified the defendant 'or' his truck at the scene." SAG at 11. In discussing what happened at the Tillicum apartment, the prosecutor stated, "[W]hen the defendant got to the [Tillicum apartment], when the truck did . . . ." 15 VRP at 1572. The prosecutor then argued, "And at that point the defendant struck Kris Cook in the face, punched him." 15 VRP at 1572. The prosecutor also argued, "The defendant and the others then went back to the truck." 15 VRP at 1573. Although Cook's testimony does not support these arguments, the prosecutor's arguments are reasonable inferences from Roger's testimony. The prosecutor did not make false statements and their arguments were not improper.

Finally, Davis argues that the prosecutor admitted "that there was no evidence to prove that the defendant/Appellant had anything to do with the shooting," admitted "Rogers 'never' saw the defendant/Appellant during the altercation," and stated "there is no evidence to the kidnapping against the defendant." SAG at 11. In doing so, Davis argues, the prosecutor's conduct was

improper because "[i]t was the prosecutor's duty not to use statements that are not supported by the record." SAG at 11.

The record shows that the prosecutor did admit "that no one was able to say 'That guy that fired the gun was the defendant.'" 15 VRP at 1624. The prosecutor continued, "We may not have direct evidence that it was . . . Davis that fired these shots. We have ample circumstantial evidence." 15 VRP at 1624. Based on Pedder's identification of Davis as the driver of the truck and Roger's testimony regarding the events that occurred at the Tillicum apartment, it was reasonable for the prosecutor to infer that Davis was at the shooting at the Tillicum apartment. And again, the prosecutor did not express any personal opinions and made no comments regarding the credibility of the witnesses. Because the prosecutor was arguing reasonable inferences from the evidence, the prosecutor's arguments were not improper.

Davis has not identified any improper arguments made by the prosecutor, therefore, his prosecutorial misconduct claim fails.

B.     CUMULATIVE ERROR DOCTRINE

Davis argues that the cumulative error doctrine applies. Cumulative error applies when numerous errors deny the defendant their right to a fair trial, "even if each error standing alone would be harmless." *State v. Venegas*, 155 Wn. App. 507, 520, 228 P.3d 813, *review denied*, 170 Wn.2d 1003 (2010). When no error occurs, the cumulative error doctrine does not apply. *State v. Clark*, 187 Wn.2d 641, 655, 389 P.3d 462 (2017). Here, because there was no error, the cumulative error doctrine does not apply.

We affirm.

21

No. 54660-4-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Maxa, J.

Cruser, A.C.J.