IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Personal Restraint of<br><br>AUSTIN LEE MAYS,<br><br>                              Petitioner. | No. 84700-7-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

COBURN, J. — Austin Lee Mays[1] brings this personal restraint petition (PRP) arguing that he is entitled to resentencing under State v. Houston Sconiers, 188 Wn.2d 1, 391 P.3d 409 (2017), because his crimes were committed when he was 15 years old and argues the trial court did not consider his youth at sentencing. We disagree and dismiss the petition.

FACTS

In the spring of 2004, Mays, then 15 years old, attempted to convince his friend to help him rob and burglarize the home of his mother's friend, Larry Kloes. His friend declined the invitation when Mays suggested that they may have to kill Kloes. Mays then asked another friend to join him in the robbery who also declined when Mays

_____

[1] Mays previously directly appealed his conviction arguing that the trial court erred in declining to exercise its juvenile jurisdiction. State v. Mays, noted at 143 Wn. App. 1013 (2008).

Citations and pincites are based on the Westlaw online version of the cited material.

raised the possibility of killing Kloes.

In May 2004, Mays and a friend broke into Kloes' home, but did not harm Kloes. Later that month, Mays again raised the idea of burglarizing Kloes' home with two other friends, 16-year-old Jeremy Boone and 18-year-old Perry Rothermel. The other boys did not know Kloes or where he lived before Mays' suggestion. Mays again explained that they may have to kill Kloes in order to complete the robbery, but neither opposed this plan. The three decided to execute the robbery in June.

A few weeks later the three met at Rothermel's house, armed with golf clubs and a baseball bat, then Mays drove them to Kloes' house, despite not having a driver's license. When they arrived at Kloes' house, they found that the garage door was open, the lights were on, and the radio was "blasting." Mays went into the house and found Kloes asleep in his second-floor bedroom. Boone knocked on the front door to lure Kloes to the first floor of the house, where Mays and Rothermel were waiting. Rothermel hit Kloes in the head with a baseball bat to incapacitate him. Kloes was able to get off the floor and escape to his bedroom and Mays told Rothermel to "get up there and finish him off." Rothermel complied, followed Kloes back to the bedroom and delivered several more blows to Kloes' head, leaving blood spatter on the bedroom ceiling. Kloes was severely injured but alive while the boys gathered the items they intended to steal.

The boys then discussed killing Kloes, which Boone agreed to do because both Rothermel and Mays claimed to have shot someone previously while Boone had not. Mays fashioned a rudimentary silencer out of a plastic bottle and electrical tape over the barrel of the gun. Mays instructed Boone to shoot Kloes in the head three times as

Kloes was laid out on the sofa. Rothermel covered Kloes' face with a pillow and Boone fired, but the gun jammed. Mays then removed the silencer, cleared the jam, replaced the silencer, and handed the gun back to Boone. Rothermel and Boone resumed their positions and Boone fired three shots into Kloes' head, killing him. The medical examiner concluded that Kloes died of multiple gunshot wounds to the head and found both bullet fragments and pieces of plastic consistent with the makeshift silencer in Kloes' brain.

The next day, Boone learned that Kloes had been found dead and an investigation had begun. Boone turned himself into police and confessed to the crime. Rothermel and Mays were arrested days later. The court found that Mays had largely acted as the leader of the group in planning and committing the crime, noting that Rothermel asked to speak to Mays three times after being arrested and advised of his rights.

Mays was charged with murder, assault, robbery, and burglary in the first degree and all but burglary as armed with a firearm. The defense presented, and the court considered, evidence of Mays' family circumstances, history of abuse and neglect, and maturity, including a forensic psychologist's report and testimony at the decline hearing. Mays presented expert testimony of psychologist, Dr. Delton Young, who opined that testing indicated Mays "will show quick impulsive reactions, little thought may be given to consequences because of his own impulsivity and immaturity." Dr. Young also explained that Mays had a lower than average IQ for his age, but was able to communicate well and may have appeared to be smarter than he actually was because he had to develop strong interpersonal skills to cope with his childhood. The court

declined juvenile jurisdiction over Mays and transferred the case for prosecution of Mays as an adult.

Mays agreed to a stipulated bench trial. During discussions on what the parties had stipulated to regarding sentence, the court reminded the parties that it is not bound to any agreement related to sentencing and that the court's "discretion may be totally eliminated if there is a certain minimum sentence that I must impose." The parties agreed and clarified that they were simply calculating the absolute minimum sentence based on statutory requirements would be a total of 40 years if the court found Mays guilty of murder in the first degree, assault in the first degree when committed with the intent to kill somebody, plus three class A firearm enhancements that must be run consecutively. In the stipulation, defense agreed to not challenge any sentence of 50 years or less and the State agreed to not challenge any sentence 40 years or more. The parties stipulated to the affidavit of probable cause, testimony and exhibits presented at the decline hearing, and the conclusions of the trial court as the evidence considered in the stipulated bench trial. The court found Mays guilty as charged on all counts.

In his sentencing memorandum, Mays argued that the court should impose the low end of the sentencing range of 40 years. Mays argued that his immaturity and failure to appreciate the risks and consequences of the crime weighed in favor of a sentence on the low end of the standard range. Mays explained that he had been raised by a mother who was addicted to methamphetamine and left him alone to care for his profoundly disabled sister for days at a time. Mays stated that he was largely responsible for the care of his sister, who was unable to care for herself, required

assistance with feeding and hygiene, and used a wheelchair. Mays also discussed the "series" of romantic partners his mother brought into his life, several of whom were abusive toward both Mays and his mother. In addition, Mays explained that he had been moved around to different caretakers in different homes and states before moving back in with his mother to a small house on Kloes' property his mother had escaped to after ending an abusive relationship.

At the sentencing hearing, Mays' attorney noted that he had turned 17 just days before the hearing. Mays also asked the court to look at the crime itself and the planning to support his assertion that he had failed to appreciate the risks and consequences due to his young age at the time of the crime. Mays argued that the group acted on circumstances as they arose and that the plan had a "fantasy-land quality" and "displays a childish and immature thinking process that is hard to believe that these boys were as old as they were." Mays' believed that there was a "million dollars" at Kloes' house and that the three would "split [the money] up and take the car and the guns and go to California." Mays argued "that's about as much of a plan as there was. No thought at all to the ramifications of any of this. Nothing. No thought which is grounded in any sort of reality." Mays argued that the group had given no thought to what would happen if Kloes discovered the missing items and theoretical million dollars, if the crime were reported to police, or whether someone would investigate if Kloes was killed. Mays also noted that he was the youngest of the group, arguing that he was unlikely to be a true mastermind of the crime.

In issuing its ruling, the trial court noted that it had presided over Mays' decline hearing and stipulated trial and was familiar with the facts of the case. The court

explained that it must consider

> Who is more responsible, the minor, who for most things in this state is considered to be not mature, not sophisticated, not responsible enough that he or she may not vote, may not enter into binding contracts, may not do many things that adults can do; is that person more culpable for acts that he or she does than an adult who is presumed to be, by the laws of this state and most other states at a certain age . . . presumed to be more mature, more sophisticated and more responsible.

Regarding the crime, the trial court stated "unfortunately, that's the way a lot of young people nowadays act about life, so little value or so little reality to them of the finality of death."

The court explained that its decision in imposing different sentences did not rest on the culpability of each defendant, but on the differences between their criminal histories and actions before and after the crime, noting

> The question put to me by [the State]: Would we be here if Austin Mays said to these other two people, Let's not shoot him. I suspect that we would not be here. But I also believe in free will and responsibility, and I know if Mr. Boone or Mr. Rothermel said, you know, this is a dumb idea, I'm not going to do it, we wouldn't be here. So I don't see the separation for the reasons stated by the State.

> In reading what occurred those fateful hours on June 26, the Court is left with the faith, with the abiding belief, that none of these defendants – and I'm including Boone – acted solely as an accomplice; all three were certainly principals, and it's nearly impossible to make a legal or factual distinction among the three in committing the offense.

> The separation that becomes between Boone and these two is what Boone did after the offense, and his lack of any criminal history. The separation that exists – and I find that there is some that exists between Mr. Mays and Mr. Rothermel – is based upon criminal history, of which Mr. Mays has offenses that score him higher, and the fact that he came after the same victim, he couldn't let it go, leads to some separation.

The court sentenced Mays to 42 years' confinement, two years longer than the minimum sentence under the SRA standard sentencing range.

In February 2018, Mays, through counsel, filed a motion in superior court for relief from his judgment, arguing that the trial court must resentence him with the mitigating effects of youth in mind, and with the awareness that it had discretion to sentence him below the SRA guidelines, as required by State v. Houston-Sconiers, 188 Wn.2d at 21. However, Mays never noted that motion for a hearing. Several years later, in July 2022, Mays' counsel filed a supplemental motion for resentencing advancing the same arguments. The State filed a response conceding "that the sentencing court did not know it had the authority to sentence Mays below the agreed lower sentencing limit of 40 years," but asserted that the motion should be denied because: (1) the trial court meaningfully considered Mays's youth at sentencing and (2) Mays had not shown that he was actually and substantially prejudiced by the court's failure to appreciate its full discretion. Mays filed a reply. The superior court transferred the matter to this court for treatment as a personal restraint petition pursuant to CrR 7.8(c)(2).

## DISCUSSION

Mays argues that his sentence should be vacated because the sentencing court failed to consider the mitigating factors of youth and was unaware of its ability to exercise discretion in sentencing him to a term of imprisonment outside the SRA standard sentencing range, even when the sentence included mandatory minimums. Because the State concedes that the sentencing court was not aware of its ability to sentence Mays below the statutory mandatory minimum, we focus our analysis on whether the court considered mitigating factors of youth.

In Houston-Sconiers, the Washington State Supreme Court established that the Eighth Amendment "requires that trial courts consider the mitigating qualities of youth at sentencing and have discretion to impose any sentence below the otherwise applicable SRA range and/or sentence enhancements when sentencing a juvenile in adult court, regardless of how the juvenile got there." In re Pers. Restraint of Carrasco, 1 Wn.3d 224, 230, 525 P.3d 196 (2023) (citing 188 Wn.2d 1, 20-21, 391 P.3d 409 (2017)). While Houston-Sconiers "announced a new substantive constitutional rule that must be applied retroactively upon collateral review," retroactivity is limited to the "substantive rule" that courts may not impose adult sentences on juveniles who possess such diminished capacity that the adult SRA ranges and enhancements would be disproportionate punishment. In re Pers. Restraint of Ali, 196 Wn.2d 220, 236, 474 P.3d 507 (2020); In re Pers. Restraint of Hinton, No. 98135-3, slip op. at 12 (Wash. Mar. 9, 2023), https://www.courts.wa.gov/opinions/pdf/981353.pdf. The "dual mandate" of Houston-Sconiers – that sentencing courts consider mitigating qualities of youth and appreciate their discretion to depart from the standard ranges – is a "procedural rule." Carrasco, 1 Wn.3d at 199. "A violation of that procedural right does not lead to the conclusion that [a defendant] is serving an unconstitutional sentence under the Eighth Amendment." Id. at 237.

On collateral review of whether the procedural mandates of Houston-Sconiers were violated at sentencing, the "ultimate question" is whether the violation "constituted a violation of the Eighth Amendment's substantive rule prohibiting punishment disproportionate to culpability." In re Pers. Restraint of Forcha-Williams, 200 Wn.2d 581, 599, 520 P.3d 939 (2022). Under the rule, a petitioner must "show by a

preponderance of the evidence that his sentence would have been shorter if the sentencing judge complied with Houston-Sconiers." Forcha- Williams, 200 Wn.2d at 599; In re Pers. Restraint of Meippen, 193 Wn.2d 310, 316, 440 P.3d 978 (2019). This follows the general rule that a defendant asserting a constitutional error must show actual and substantial prejudice to obtain collateral relief. Forcha-Williams, 200 Wn.2d at 601.

Here, Mays fails to show by a preponderance of the evidence that his sentence would have been shorter had the sentencing judge complied with Houston-Sconiers. Mays argues that the trial court violated Houston-Sconiers when it did not consider and weigh the Miller factors of the "hallmark features" of youth, "immaturity, impetuosity, and failure to appreciate risks and consequences," and failed to consider the juvenile's surrounding environment. See Miller v. Alabama, 567 U.S. 460, 477, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012). However, the record reflects that the trial court did consider concepts nearly identical to these factors. The trial court had received and evaluated extensive evidence regarding Mays' childhood circumstances, including abuse, neglect, instability, and being forced to act as a caretaker for his disabled sister as the result of his mother's drug abuse. This evidence was presented to the court at the decline hearing, the exhibits and testimony of which were stipulated to as evidence in his bench trial. This evidence included the expert report and testimony of a forensic psychologist about Mays' immaturity and reduced ability to control impulses as a result of his traumatic and unstable childhood and adolescence. The trial court also explained that in sentencing Mays it considered his culpability as a minor, noting that minors are generally thought of as less mature, sophisticated, and responsible than adults, in

9

comparison to Rothermel, who had been 18 at the time of the crime.

Mays attempts to support his assertion by relying on Domingo-Cornelio, however the circumstances in that case were far different than here. 196 Wn.2d 255, 474 P.3d 524 (2020). Unlike the extensive presentation of evidence regarding Mays' age, mental abilities, maturity, and effects of his background on his culpability for the crime, in Domingo-Cornelio "the only relevant information presented to the sentencing court was Domingo-Cornelio's age at the time of the crimes." 196 Wn.2d at 267.

The record does not support Mays' assertion that the sentence would have been lower had the trial court been aware of its discretion. The court could have sentenced Mays to the mandatory minimum sentence of 40 years, but instead sentenced him to 42 years. The court reasoned that 42 years was appropriate because Mays made repeated unsuccessful attempts to mobilize other friends to join him in the crime, even telling them of the possibility of killing Kloes in the process before finally finding Rothermel and Boone, who agreed to join. The trial court also explained that the sentence imposed was based on Mays' own criminal history, where his co-defendants had none.

Unlike Ali, in which the sentencing court was similarly presented with significant evidence of mitigating circumstances of youth, but sentenced the defendant to low end of the SRA range believing it "lacked the discretion to impose" anything less, the court sentenced Mays to a higher than minimum sentence after considering the mitigating circumstances of his youth. 196 Wn.2d at 243-45.

Mays has not met his burden to show that the sentence would have been shorter had it complied with Houston-Sconiers.

We dismiss the petition[2] and need not determine whether Mays demonstrated actual and substantial prejudice.

_Coburn, J._

WE CONCUR:

_Díaz, J._          _Mann, J._

---

[2] In his reply to the State's briefing to the trial court, Mays for the first time argues that because a term of imprisonment of life without parole had not yet been ruled unconstitutional for juvenile defendants, Mays was improperly coerced into signing the stipulation agreement. "An issue raised and argued for the first time in a reply brief is too late to warrant consideration." Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). We decline to review the issue.